IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EASTERN SAVINGS BANK, FSB, | § | |
| | § | No. 695, 2014 |
| Defendant-Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware in and |
| v. | § | for New Castle County |
| | § | |
| CACH, LLC | § | |
| | § | C.A. No. N13A-09-008 |
| Plaintiff-Below, | § | |
| Appellee. | § | |

Submitted: August 19, 2015
Decided: September 28, 2015

Before **STRINE**, Chief Justice, **HOLLAND, VALIHURA, VAUGHN,** and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED.**

David E. Matlusky, Esquire, The Matlusky Firm, LLC, Wilmington, Delaware, for Appellant.

Patrick Scanlon, Esquire; Law Offices of Patrick Scanlon, P.A., Milford, Delaware, for Appellee.

**VAUGHN,** Justice, for the Majority:

This case involves a question of priority between two lien creditors: who is entitled to be paid first from the proceeds of a mortgage foreclosure sale, the creditor who recorded its lien against the property first, or a second creditor who recorded later, but did so as part of a refinancing in which it discharged preexisting mortgages and judgment liens on the same property? In the proceedings below, the second creditor to record its lien, Eastern Savings Bank, FSB ("Eastern Savings"), argued that the doctrine of equitable subrogation protected its right to receive the proceeds of the foreclosure sale first, even though it recorded its mortgage after the first creditor, CACH, LLC ("CACH"), recorded its judgment. The Court of Common Pleas and the Superior Court both disagreed, and held that CACH was entitled to be paid before Eastern Savings under Delaware's pure race recording statute.[1]

Eastern Savings now appeals from the Superior Court order denying its appeal of a Court of Common Pleas' order granting summary judgment to CACH. On appeal, Eastern Savings contends that the Superior Court erred by failing to apply the doctrine of equitable subrogation to place the priority of its mortgage above CACH's lien. We disagree and find that the doctrine of equitable subrogation is inapplicable to the facts of this case. Thus, the parties' priorities are governed by Delaware's race

---

[1] *See* 25 *Del. C.* § 2106.

2

recording statute, and the judgment of the Superior Court is affirmed.

## I. FACTS AND PROCEDURAL HISTORY

The facts of this case are not in dispute. CACH obtained a judgment against Aaron Johnson, Jr., to satisfy a deficiency balance on Johnson's car loan on December 7, 2006. CACH transferred its judgment to the Superior Court on December 21, 2006. As of that date, the property records reflected that Johnson individually owned property located at 19 Sanford Drive in Newark, Delaware. CACH's judgment therefore became a lien on that property on December 21, 2006.

On December 19, two days before CACH obtained its lien on the premises at 19 Sanford Drive, Johnson engaged in a mortgage refinancing with Eastern Savings. In the course of that transaction, Johnson executed a deed conveying the property to himself and his wife, Angela, as tenants by the entireties. Both Johnsons then executed a mortgage in the amount of $168,000 to Eastern Savings. Loan proceeds were used to pay off five previous debts secured by liens upon the Newark property: a mortgage to Wilmington Trust Company, dated June 29, 1999; a mortgage to Pacific Shore Funding dated July 25, 2002; a judgment to Norman E. Levine dated June 7, 2004; a judgment to the State of Delaware dated September 27, 2006; and a judgment to First Premier Bank dated March 10, 2006. The total debt paid with Eastern Savings' funds was $148,479.56. The CACH judgment lien, which had not

3

yet been recorded, was not paid off as part of the refinancing. But the funds loaned by Eastern Savings exceeded the liens paid off by more than $19,000, more than the amount owed on CACH's judgment lien.[2]

The Eastern Savings mortgage was not recorded until December 29, ten days after it was executed. According to the stipulated facts, "[a]t the time of recording a bring-down search was done by Global Title. The law office and the title company took no action at that time."[3] Johnson's two previous mortgages, to Pacific Shore Funding and to Wilmington Trust Company, were satisfied as of record on January 25 and February 26, 2007, respectively.

To summarize the key dates:

- Dec. 7, 2006: CACH obtained a judgment against Aaron Johnson, Jr.
- Dec. 19, 2006: Johnson refinanced, and with his wife, executed a mortgage in the amount of $168,000 to Eastern Savings.
- Dec. 21, 2006: CACH recorded its judgment lien.
- Dec. 29, 2006: Eastern Savings recorded its mortgage.
- Jan. 25, 2007: Satisfaction of Pacific Shore Funding mortgage was recorded.
- Feb. 26, 2007: Satisfaction of Wilmington Trust Company mortgage was recorded.

In August 2008, Eastern Savings filed a foreclosure action against the Johnsons

---

[2] The exact amount of CACH's lien at the time it was recorded is not in the record, but it could not have been more than $16,000, the amount owed to CACH at the time Eastern Savings filed its foreclosure action against the Johnsons.

[3] Appellant's Op. Br. at 3.

for the property located at 19 Sanford Drive. An attorney for CACH informed Eastern Savings' attorney that CACH's lien, then worth approximately $16,000, was ahead of Eastern Savings' mortgage, but Eastern Savings did not respond. On April 14, 2009, the Johnsons' property was sold at a sheriff's sale for $133,000. Minus the costs of the sale, the sheriff sent Eastern Savings all of the proceeds, which were insufficient to satisfy the Johnsons' outstanding mortgage debt. CACH demanded that its judgment be paid by Eastern Savings. Eastern Savings refused. CACH then filed suit in the Court of Common Pleas, alleging misappropriation and unjust enrichment.

Eastern Savings filed a motion to dismiss, which the Court of Common Pleas granted. On appeal, the Superior Court reversed that decision, holding that CACH's judgment lien had been discharged at the sheriff's sale, and that CACH's lien had priority over Eastern Savings' mortgage.[4] This Court affirmed the Superior Court's judgment, and remanded the case to the Superior Court to be remanded to the Court of Common Pleas.[5] Eastern Savings filed a motion for reargument, arguing that this Court did not consider whether the doctrine of equitable subrogation could move it to the front of the line. This Court issued an order clarifying that:

---

[4] *CACH, LLC v. E. Sav. Bank, FSB*, 2011 WL 4730525, at *5 (Del. Super. Sept. 30, 2011).
[5] *E. Sav. Bank, FSB v. CACH, LLC*, 55 A.3d 344, 346, 351 (Del. 2012).

> When we concluded . . . that the record did not reflect that proceeds from appellant's mortgage were used to pay off a prior mortgage on the property, we did not intend to preclude a presentation of facts that could show otherwise. To the extent that our Opinion . . . could be read to bar the presentation of facts supporting a claim of equitable subrogation, we have granted reargument. We believe the issue could be fairly presented to the Court of Common Pleas.[6]

Accordingly, on remand, the Court of Common Pleas considered Eastern Savings' claim that the doctrine of equitable subrogation applies, such that Eastern Savings was first in priority and thus had the right to all of the proceeds from the sheriff's sale. The Court of Common Pleas held that the doctrine was not applicable to the facts of this case, both because equitable subrogation does not apply to mortgage refinances in Delaware, and because Eastern Savings had not satisfied all of the elements required to warrant subrogation.[7] The Superior Court affirmed, finding that equitable subrogation was not available to overcome Delaware's race recording statute.[8] This appeal followed.

## II. ANALYSIS

"We review the Superior Court's grant or denial of a summary judgment motion *de novo*."[9]

---

[6] *E. Sav. Bank, FSB v. CACH, LLC*, 2012 WL 9298300, at *1 (Del. Oct. 30, 2012).

[7] *CACH, LLC v. E. Sav. Bank, FSB*, C.A. No. CPU4-09-009022 (Del. Com. Pl. June 3, 2013).

[8] *E. Sav. Bank, FSB v. CACH, LLC*, 2014 WL 3827496, at *4-5 (Del. Super. July 31, 2014).

[9] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011).

6

## A. Delaware's Pure Race Recording Statute

In Delaware, the priority of mortgages is governed by 25 *Del. C.* § 2106. Section 2106 is a pure race statute, providing that the time of recording is determinative of the priority of competing creditors.[10]  "The rule is first in time, first in right."[11]   Specifically, § 2106 provides that:

> A mortgage, or a conveyance in the nature of a mortgage, of lands or tenements shall have priority according to the time of recording it in the proper office, without respect to the time of its being sealed and delivered, and shall be a lien from the time of recording it and not before.[12]

In the case at bar, CACH recorded its judgment lien against Johnson on December 21, 2006, eight days before the Eastern Savings mortgage was recorded. Thus, the CACH judgment has priority over the Eastern Savings Mortgage under the race recording statute.

Eastern Savings, however, contends that the doctrine of equitable subrogation should be applied to allow it to take priority over the CACH judgment. Eastern Savings argues that the doctrine of equitable subrogation is applicable to a mortgage refinancing, and that it has satisfied the elements required to be subrogated in this case.  Eastern Savings contends that because it paid the preexisting mortgages and

---

[10] *First Mortg. Co. v. Fed. Leasing Corp.*, 456 A.2d 794, 795 (Del. 1982).
[11] *Id.*
[12] 25 *Del. C.* § 2106.

judgments on the Johnsons' property, it stepped into the shoes of those previous lien-holders for purposes of being first in priority to receive the proceeds from the foreclosure sale. CACH responds that Eastern Savings cannot jump ahead in priority, both because equitable subrogation does not apply to mortgage refinances in Delaware, and because Eastern Savings has not satisfied the requirements to be subrogated on the facts of this case.

## B. The Doctrine of Equitable Subrogation

Equitable subrogation is a doctrine that "allows one who has discharged the debt of another to succeed to the rights of the satisfied creditor."[13] For example, if Creditor #3 pays off a debt owed to Creditor #1 by the same debtor, equitable subrogation would enable Creditor #3 to jump ahead of Creditor #2 in priority for repayment. The doctrine, which began in the English courts of equity as a way for a surety to seek repayment from a defaulting debtor,[14] has been applied by the Delaware Court of Chancery for over a century.[15]

Under the Court of Chancery's precedent, there are five elements necessary to

---

[13] *E. Sav. Bank, FSB*, 55 A.3d at 351 (quoting *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 2007 WL 4054231, at *17 (Del. Ch. Nov. 9, 2007)) (internal quotations omitted).

[14] Gregg H. Mosson, Comment, *Equitable Subrogation in Maryland Mortgages and the Restatement of Property: A Historical Analysis for Contemporary Solutions*, 41 U. BALT. L. REV. 709, 715 (2012).

[15] *See Miller v. Stout*, 5 Del. Ch. 259, 261 (1878) ("When a surety or guarantor pays a debt of a principal, equity substitutes him in the place of a creditor, as a matter of course, without any special agreement to that effect.").

establish a claim for equitable subrogation:

> (1) payment must have been made by the subrogee to protect his or her own interest; (2) the subrogee must not have acted as a volunteer; (3) the debt paid must have been one for which the subrogee was not primarily liable; (4) the entire debt must have been paid; and (5) subrogation must not work any injustice to the rights of others.[16]

As in other jurisdictions,[17] the Court of Chancery has expanded its use of the doctrine beyond its narrow origins for other equitable reasons.[18] No Delaware court,

---

[16] *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 2007 WL 4054231, at *17 (Del. Ch. Nov. 9, 2007) *aff'd*, 961 A.2d 521 (Del. 2008).

[17] *See* Mosson, *supra* note 14, at 717 ("By the end of the 1800s in America, subrogation had expanded to apply to refinancing lenders in some jurisdictions . . . . By the 1920s and 1930s, American subrogation covered various just claims by plaintiffs to stand in another's shoes and seek repayment."). The majority of states still do not permit those with actual notice of the pre-existing lien to move up in priority, and a minority of jurisdictions do not permit a party with either actual or constrictive (*i.e.*, record) knowledge to be subrogated. 73 Am. Jur. 2d *Subrogation* § 58 (1974); *see also* Glenn R. McGillivray, *What's your priority?: Revitalizing Pennsylvania's Approach to Equitable Subrogation of Mortgages After* First Commonwealth Bank v. Heller, 58 VILL. L. REV. 301, 310 (2013). For two cases in which courts have rejected the broader application of equitable subrogation and adopted the minority view, see *Wells Fargo Bank, Minn., N.S. v. Ky., Fin. & Admin., Dep't of Revenue*, 345 S.W.3d 800, 807-08 (Ky. 2011) ("[T]he Court observes that equity demands that sophisticated businesses, like professional mortgage lenders, should be held to a higher standard for purposes of determining whether the lender acted under a justifiable or excusable mistake of fact in failing to duly investigate prior liens. Equity also demands that the responsibility for a defective title examination be allocated to the party who is most culpable.") (internal citations omitted); *Countrywide Home Loans, Inc. v. First Nat'l Bank of Steamboat Springs, N.A.*, 144 P.3d 1224, 1230 (Wyo. 2006) ("Having considered our statute and the cases from other states in which courts have applied equitable subrogation in the context of mortgage re-financing, we decline to adopt the Restatement. Unlike the trend in other courts, we are not persuaded any manifest injustice results from applying the express language of [Wyoming's recording statute] and adhering to the clear legislative intent that lien priority in Wyoming is to be determined by the date of recording.").

[18] *See, e.g.*, *E. States Petroleum Co. v. Universal Oil. Prods. Co.*, 44 A.2d 11, 15 (Del. Ch. 1945) ("Originally, that remedy might have been largely confined to cases involving the relation of principal and surety, but it now has a much broader application; and when right and justice demand it the tendency is to extend, rather than to restrict, its application.").

however, has ever applied the doctrine to enable a mortgage lender who funds a homeowner's refinancing to assume the position of the original lender. Nevertheless, the Appellant relies on two Court of Chancery cases to support its claim that the doctrine should be applied to the facts of this case.

In *Stoeckle v. Rosenheim*, a case from 1913, there were three competing mortgages.[19] Stoeckle, the second mortgage-holder, paid off the first mortgage, erroneously believing at the time that the third mortgage-holder's mortgage had also been paid off in full. Based on the specific facts of the case, the Court of Chancery deemed Stoeckle's mistake to be a reasonable one, and reinstated the first mortgage for the benefit of Stoeckle. The Court of Chancery also granted Stoeckle's request for a preliminary injunction to stay the foreclosure proceedings brought by the third mortgage-holder.[20] In that case, Stoeckle paid off the first mortgage in order to protect his interest in the second mortgage which he held. 25 *Del. C.* § 2106 was neither discussed nor implicated in the decision.

More recently, in *Oldham v. Taylor*, the Court of Chancery applied the doctrine

---

[19] *Stoeckle v. Rosenheim*, 87 A. 1006, 1007 (Del. Ch. 1913).
[20] The Court of Chancery reasoned:
> [T]he overlooking by the complainants of the right to be subrogated to the rights of the first mortgagee, or to be treated as the equitable assignees of that mortgage, is to be considered in this court as analogous to, if not identical with, a mistake of fact, and, therefore, entitles the second mortgages to relief from the consequences of such a mistake.

*Id.* at 1008.

of equitable subrogation to prevent unjust enrichment.[21]  In that case, three members of a family owned a property subject to two mortgages.  Two of the family members, who together owned a one-half interest in the property, refinanced by paying off the two existing mortgages with the proceeds of a new loan without informing the third family member, Oldham.[22]  The two family members executed a note and a mortgage on the entire property (including Oldham's one-half interest) in favor of the new lender, Associates Financial Services Company, Inc. ("AFS").  After Oldham learned what had happened, she filed an action in the Court of Chancery contending that the new mortgage was void and unenforceable against her, and sought to quiet title with regards to her one-half interest.[23]

The Court of Chancery determined that the AFS mortgage was unenforceable against the plaintiff, but that she was still liable to AFS or the defendants under the doctrine of equitable subrogation.[24]  The court found that it would unjustly enrich Oldham if she was not responsible for any portion of the mortgage debt, and accordingly required her to pay half of the balance of the two previous mortgages.[25]

---

[21] 2003 WL 21786217, at *5 (Del. Ch. Aug. 4, 2003).
[22] *Id.* at *2.
[23] *Id.* at *3-4.
[24] *Oldham*, 2003 WL 21786217, at *4-5.
[25] *Id.* at *4-5. "The basis for this argument is that under the doctrine of subrogation, Oldham's liability to pay that previous mortgage debt was shifted from the prior mortgage lenders to [the new lender] when [it] paid those prior mortgage creditors off.  That is, metaphorically speaking, [the new lender] stepped into the shoes of the former mortgage lenders, with the result that after the

11

The Court of Chancery observed that the plaintiff would have, "[o]therwise, . . . receive[d] an unearned windfall by being discharged from liability on the mortgage debts without having paid any consideration."[26] In reaching its conclusion, the court explained that "subrogation rights arise to prevent unjust enrichment of a party whose obligation is fully performed by another."[27]

## C. The Doctrine of Equitable Subrogation is Inapplicable Here

Unlike *Stoeckle* and *Oldham*, there was no reasonable mistake or unjust enrichment in this case.[28] Nor is there any other equitable reason as to why the

---

refinancing, Oldham's obligation to repay her share of the preexisting mortgages ran to [the new lender]." *Id.* at *4.

[26] *Id.* at *5. The *Oldham* Court applied the doctrine of equitable subrogation to remedy a finding of unjust enrichment. *Oldham*, 2003 WL 21786217, at *5. "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)) (internal quotations omitted).

[27] *Oldham*, 2003 WL 21786217, at *5. This case provides little support for the Appellant's claim. As the Superior Court stated in its opinion, "[a]lthough the *Oldham* Court uses the language of equitable subrogation, the Court of Common Pleas considered the analogy to this matter before the Court, and determined that, conceptually, *Oldham* is better understood as relying on a more general theory of unjust enrichment." *E. Sav. Bank, FSB*, 2014 WL 3827496, at *5.

[28] In order to show unjust enrichment, there must be: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec*, 991 A.2d at 1130. Eastern Savings argues that the Superior Court's judgment will unjustly enrich CACH at its expense. But there is no hardship to Eastern Savings, who presumably contracted with Global Title so that it would be protected in the event that the title search failed to turn up any missing liens. Because Eastern Savings obtained title insurance, it has an adequate legal remedy at its disposal: pursuing a claim against Global Title for the amount of the proceeds it pays to CACH. *Cf. Wells Fargo Bank, Minn., N.A.*, 345 S.W.3d at 808 ("However, the Court presumes that both lending institutions involved in this case have viable claims against their respective title insurance companies. Those title insurers are engaged in the very profitable business of assuring that their lending institution customers receive a clear title by insuring

doctrine of equitable subrogation should be applied. Thus, the question becomes: should Delaware permit refinancing lenders to jump ahead in priority when the funds that they disburse are used to pay off pre-existing mortgages, absent any other equitable reason? We decline to extend the equitable doctrine's reach to such circumstances.

Equitable subrogation has never been used to undercut the authority of a Delaware statute without equitable cause. When, as here, there is no equitable reason to set aside the provisions of Delaware's pure race recording statute, the rule of "first in time, first in right" governs the priority of the parties' competing claims. CACH recorded its judgment lien eight days before Eastern Savings recorded its mortgage. If the mortgage had been timely recorded with a proper bring-down title search, the issue of the CACH lien would have been avoided, or revealed and addressed. Eastern Savings has an adequate legal remedy at its disposal:[29] pursuing a claim against Global Title and/or the settlement agent for the amount of the proceeds it pays

---

such. If the title insurer's examiners bungle the title search, no matter how innocent the mistake might be, then the title insurers must ultimately be held liable."); *ABN AMRO Mortg. Grp. v. Kangah*, 934 N.E.2d 924, 927 (Ohio 2010) ("ABN would not be seeking equitable subrogation but for someone's negligence. That circumstance alone was enough to defeat equitable subrogation in *Jones*. Whether ABN or the title insurance company it employed was negligent is uncertain. If the title insurance company was negligent, ABN may have a claim against it for its loss, negating its need for equitable subrogation.").

[29] *Chavin v. H. H. Rosin & Co.*, 246 A.2d 921, 922 (Del. 1968) ("It is, of course, axiomatic that Equity has no jurisdiction over a controversy for which there is a complete and adequate remedy at law.") .

to CACH. We will not apply the doctrine of equitable subrogation to cure the failure of Eastern Savings' title insurer or settlement agent to ensure that Eastern Savings' was placed in a first lien position before completing the settlement process.

Moreover, Delaware courts have refused to apply subrogation when it would "work any injustice to the rights of others."[30] Eastern Savings argues that CACH would not be disadvantaged because its lien was always behind the other mortgages and judgment liens that Eastern Savings' funds paid to satisfy. But to say that CACH is in no worse of a position than it would have been had Johnson not entered into the refinance focuses only on CACH's position in priority, and ignores the fact that Eastern Savings' loan left Johnson further in debt than he was beforehand.

Eastern Savings' argument also ignores the fact that CACH did not bargain for its subordinate position. In other cases in which courts have applied the doctrine of equitable subrogation, the intervening lien-holder was another mortgage lender who had agreed when lending money to be third or fourth in priority.[31] By contrast, here, CACH's property lien was obtained as a result of a judgment from the Court of Common Pleas. It therefore never agreed to be subordinated to another mortgage

---

[30] *Reserves Dev. LLC*, 2007 WL 4054231, at *17 (quoting 73 Am. Jur. 2d *Subrogation* § 5 (2007)).
[31] *See, e.g.*, *Bank of America, N.A. v. Prestance Corp.*, 160 P.3d 17, 23-24 (Wash. 2007) (concluding that equitable subrogation should apply to prevent an unearned windfall to Bank of America, who had agreed to provide the borrower with a line of credit on a property that was already subject to another mortgage; it was the new lender's understanding that Bank of America's deed of trust would be reconveyed following the refinance and thus the new lender would be first in priority).

14

loan, and it therefore will not receive an "unearned windfall" if it is paid the amount of the judgment to which it is entitled by law.[32]

## III. CONCLUSION

For all of the preceding reasons, the judgment of the Superior Court is **AFFIRMED**.

---

[32] *Cf. Mortg. Elec. Registration Sys., Inc. v. Roberts*, 366 S.W.3d 405, 411 (Ky. 2012) ("MERS argues that if the Court of Appeals' decision stands, Roberts will have received an 'unearned windfall' merely because of New Century's (and MERS's) mistake in running the title searches. But what will happen in this case is not a true 'windfall.' Certainly, Roberts will *benefit* by gaining first priority. It becomes more likely that he will receive the full amount of his $25,894.63 judgment against the homeowners when the property is sold, because the proceeds will go to pay his lien first. But he will only get exactly what he is already entitled to: the amount of the judgment. And it is inaccurate to claim, as MERS does, that this course of events causes Roberts to get something better than what he expected when he placed the lien on the property. When Roberts recorded the judgment lien in June 2000, his expectation was that he would have second priority to The Money Store's mortgage, but that he would have superior priority to all *subsequent interests*. New Century could have obtained a subordination agreement from Roberts, but it did not (apparently because it failed to locate Roberts' lien by doing a proper title search). And so Roberts moved into first priority. This is not a windfall; it is the way a race-notice recording scheme works.").

**SEITZ**, Justice, dissenting:

The October 30, 2012 order from this Court remanded the case to the Superior Court, to remand to the Court of Common Pleas, to allow the presentation of facts by Eastern in support of an equitable subrogation claim.[33]   In my view, the facts stipulated by the parties after remand satisfy all of the elements of an equitable subrogation claim.   Equitable subrogation is also compatible with Delaware's recording statutes, is supported by Delaware precedent in the mortgage priority area, and the doctrine should be applied here because it serves important policy interests beyond this case.   Summary judgment should have been granted to Eastern, and CACH's complaint should have been dismissed.  I respectfully dissent.

Procedural Background

As the Majority notes, the dispute arose out of a refinancing transaction where the Johnsons secured a loan from Eastern to refinance and consolidate two notes secured by mortgages, and to satisfy three judgment liens on their property.[34]   In between the time the Johnsons executed a new note and mortgage with Eastern, and the time Eastern's attorney recorded the new mortgage, CACH recorded a judgment

---

[33] *E. Sav. Bank, FSB v. CACH, LLC*, 2012 WL 9298300, at *1 (Del. Oct. 30, 2012) (Table).

[34] App. to Opening Br. at 45.  The existing notes and judgments prior to refinancing were 6/29/99 – Wilmington Trust mortgage $106,902.00; 7/25/02 – Pacific Shore Funding mortgage $23,724.40; 6/07/04 – Attorney judgment lien $16,838.31; 3/10/06 – First Premier Bank judgment lien $715.00; and 9/27/06 – State of Delaware lien $299.85.

16

against Mr. Johnson for a deficiency balance on his auto loan.[35]

After the housing bubble burst and the Johnsons defaulted on the Eastern note, Eastern filed a mortgage foreclosure action. The New Castle County Sheriff sold the Johnsons' property at a mortgage foreclosure sale and distributed the sale proceeds net of expenses only to Eastern.[36] The sale proceeds were less than the balance of the Johnsons' outstanding mortgage loan to Eastern, and less than the amount Mr. Johnson owed on the prior mortgages and judgments paid off in the refinancing transaction with Eastern. CACH demanded satisfaction of its lien from Eastern, but Eastern refused, leading to this long-running litigation.

In our first decision on August 24, 2012, we recognized a claim for equitable subrogation, which allows "one who has discharged the debt of another to succeed to the rights of the satisfied creditor."[37] We also noted a limitation on the doctrine, and required a showing that "the refinanced loan proceeds were actually used to pay

---

[35] App. to Opening Br. at 45-46. According to the Statement of Stipulated Facts, CACH transferred the judgment to Superior Court and had it recorded two days after the Johnsons executed their mortgage to Eastern, and five days before Eastern recorded its mortgage on December 29, 2006. App. to Opening Br. at 45. The judgment attached as a lien on the property from the time of its entry upon the Superior Court docket on December 21, 2006. 10 *Del. C.* §§ 4202-4207. The judgment attached to the property before Mr. Johnson transferred title in the property on December 29, 2006 to joint ownership with his wife. The title transfer was no doubt required as part of the refinancing transaction to have both husband and wife on the deed.

[36] App. to Opening Br. at 46.

[37] *E. Sav. Bank*, *FSB* v. CACH, LLC, 55 A.3d 344, 351 (Del. 2012) (quoting *Reserves Dev. LLC. v. Severn Sav. Bank, FSB*, 2007 WL 4054231, at *17 (Del. Ch. Nov. 9, 2007)).

17

off the prior mortgages."[38]  Although such proof was lacking in the appellate record, on a motion for reargument we remanded to the Court of Common Pleas with the following instruction:

> When we concluded in our Opinion dated August, 24, 2012 that the record did not reflect that proceeds from appellant's mortgage were used to pay off a prior mortgage on the property, we did not intend to preclude a presentation of facts that could show otherwise . . . .
> To the extent that our Opinion dated August 24, 2012 could be read to bar the presentation of facts supporting a claim of equitable subrogation, we have granted reargument. We believe the issue could be fairly presented to the Court of Common Pleas.[39]

Following remand, the parties stipulated to the missing record evidence; namely, that the "proceeds from Eastern's mortgage were used to pay off a prior mortgage on the property."[40]  The Court of Common Pleas thereafter denied Eastern's motion for summary judgment directed to equitable subrogation.  The Superior Court then affirmed, not based on its analysis of the stipulated facts and whether they satisfied the elements of equitable subrogation, but instead on an issue of law; that "equitable subrogation is not available to overcome Delaware's race recording statute."[41]

 Equitable Subrogation

---

[38] *E. Sav. Bank*, 55 A.3d at 351 (quoting *Oldham v. Taylor*, 2003 WL 21786217, at *5 (Del. Ch. Aug. 4, 2003)).

[39] *E. Sav. Bank*, 2012 WL 9298300, at *1.

[40] *E. Sav. Bank*, 55 A.3d at 351; App. to Opening Br. at 45.

[41] *E. Sav. Bank, FSB v. CACH, LLC*, 2014 WL 3827496, at *4 (Del. Super. July 31, 2014).

Equitable subrogation "allows 'one who has discharged the debt of another to succeed to the rights of the satisfied creditor.'"[42] The doctrine, as applied in the mortgage context, is summarized in the Restatement (Third) of Property (Mortgages) § 7.6(a):

> One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.[43]

An equitable subrogee, meaning the person or institution that refinanced the existing debt, might or might not have her own lien on the property. The subrogee is simply the "payer" of the secured obligation.[44] As explained by the Restatement, equitable subrogation preserves the existing priority of all secured creditors in a refinancing transaction, which prevents a junior creditor from unfairly jumping ahead in the priority line where problems occur with the perfection of the lender's security interest:

> Subrogation to a mortgage is usually of importance only when a subordinate lien or other junior interest exists on the real estate . . . . In this setting the subrogee wants more than a lien; he or she wants a lien with the priority of the original mortgage, and this is precisely what subrogation gives. The holders of intervening interests can hardly

---

[42] *E. Sav. Bank*, 55 A.3d at 351 (quoting *Reserves Dev.*, 2007 WL 4054231, at \*17).
[43] Restatement (Third) of Property (Mortgages) § 7.6(a).
[44] *Id*. at § 7.6, cmt. a.

complain about this result, for they are no worse off than before the senior obligation was discharged. If there were no subrogation, such junior interests would be promoted in priority, giving them an unwarranted and unjust windfall.[45]

In Delaware, as early as 1945, the Chancellor stated that equitable subrogation should be expansively applied to prevent injustice:

Originally, that remedy might have been largely confined to cases involving the relation of principal and surety, but it now has a much broader application; and when right and justice demand it the tendency is to extend, rather than to restrict, its application. One who pays the debt of another at his direct or indirect request is, therefore, usually entitled to subrogation.[46]

Equitable subrogation is now a recognized doctrine in many states and applied in one form or another.[47] As discussed next, with the refinancing boom of the last decade and the foreclosure crisis of the current decade, its application takes on even greater importance for consumers and lenders.

Equitable Subrogation And Mortgage Refinancings

Given the limited case law addressing equitable subrogation in the refinancing context in Delaware,[48] it is important to consider the policy reasons behind a broader application of equitable subrogation in the mortgage refinancing context. Equitable

---

[45] *Id.*

[46] *E. States Petroleum Co. v. Universal Oil Prods. Co.*, 44 A.2d 11, 15 (Del. Ch. 1945).

[47] *See Bank of Amer., N.A. v. Prestance Corp.*, 160 P.3d 17, 21-27 (Wash. 2007) (collecting cases).

[48] Delaware is not alone in having little case law on point, at least in the context of mortgage refinancing. *Prestance*, 160 P.3d at 26 n.15 ("There are few, if any, early cases discussing equitable subrogation in the context of refinancing since refinancing has become more popular only recently.").

20

subrogation is like the equitable doctrine of replacement, where the same lender replaces its old mortgage with a new one.[49] In both instances, liberally applying equitable principles facilitates a borrower's ability to obtain more favorable loan terms and save on the costs of the refinancing transaction, most directly the title insurance premium.[50] For instance, two authors who examined the economics of title insurance during the refinancing wave in the 2001-03 period estimated the aggregate cost of title insurance at $16 billion. The authors "demonstrated that title insurance costs in residential mortgage refinancings represent billions of dollars annually—costs that are now borne overwhelmingly by homeowners."[51]

As the authors note, "[these] sums [are], from the viewpoint of consumers, a deadweight loss because consumers have no independent need or desire for a new title insurance policy when refinancing."[52] With the current foreclosure crisis and

---

[49] *See* Restatement (Third) of Property (Mortgages) § 7.3(a) ("If a senior mortgage is released of record and, as part of the same transaction, is replaced with a new mortgage, the latter mortgage retains the same priority as its predecessor . . . ."); *Freedom Mortg. Corp. v. Trovare Homeowners Ass'n*, 2012 WL 5986441, at *3 (D.Nev. Nov. 28, 2012). *See also Prestance*, 160 P.3d at 27 ("It is common sense that the same lender should not lose priority for renegotiating a mortgage with the debtor. Why should it be any different when a new lender renegotiates that same mortgage? As long as the junior interests are not materially prejudiced, then equitable subrogation maintains the proper priorities.").

[50] Grant S. Nelson & Dale A. Whitman, *Adopting Restatement Mortgage Subrogation Principles: Saving Billions of Dollars for Refinancing Homeowners,* 2006 BYU L. REV. 305, 365-66 (2006) ("[Title insurers] pay claims out of the premiums paid by their insureds, and if they are forced to pay unnecessary claims, the competitive forces of the insurance market will inevitably drive their premiums upward, making settlement costs higher for all mortgagors. There is simply no reason to impose on consumers the cost of giving windfall promotions of priority to junior lienholders.").

[51] Nelson & Whitman, *supra* note 18, at 365.

[52] *Id.* at 310.

refinancing as an alternative to foreclosure in a low interest rate environment, the cost to consumers of unnecessary title insurance now likely far eclipses the cost and potential savings in the early 2000s.[53]  As stated by the Washington Supreme Court:

> a liberal equitable subrogation doctrine can save billions of dollars by reducing title insurance premiums.  Title insurance primarily ensures there are no intervening liens, and when a jurisdiction adopts the liberal view of equitable subrogation, the insurance premium is greatly reduced.[54]

In the absence of liberal application of replacement and subrogation rights where lien priorities are in dispute in a refinancing, borrowers are locked into the terms of their original mortgages or subject to monopoly power on the part of their original lenders when seeking to refinance.[55]  Where lenders are assured the protections of equitable subrogation, it can reduce or eliminate the unnecessary tax of title insurance on refinancing transactions.

The Doctrine is Compatible with Delaware's Recording Statutes and Consistent with Existing Delaware Law

---

[53]  Glen R. McGillivray, Note, *What's Your Priority?: Revitalizing Pennsylvania's Approach to Equitable Subrogation of Mortgages After First Commonwealth Bank v. Heller*, 58 VILL. L. REV. 301, 305 (2013) (noting popularity of refinancing alternative to sub-prime loan foreclosure proceedings).

[54] *Prestance*, 160 P.3d at 28.

[55] *See Prestance*, 160 P.3d at 25 ("Refinancings are common place in today's economy. Permitting a junior lienholder to leapfrog the priority of the current senior mortgage would impair the owner's access to more favorable interest rates.  Unless a junior lienholder is disadvantaged by permitted subrogation, we see no reason to give the junior lienholder in effect the right to block or object to the refinancing."); McGillivray, *supra* note 20 at 305 ("[L]enders are reluctant to refinance loans in states where they are not ensured that they will be the primary lienholders on the property.").

As the Majority notes, Delaware has a "pure race recording statute."[56] The statute provides that "[a] deed concerning lands or tenements shall have priority from the time it is recorded in the proper office without respect to the time that it was signed, sealed and delivered."[57] The Superior Court, in affirming the decision of the Court of Common Pleas on remand, agreed that the plain meaning of § 153, taken together with the plain meaning of Delaware's other recording statutes, "strongly evidences a legislative intent to prevent any exception to the race recording rule."[58] The Court of Common Pleas placed particular emphasis on 25 *Del. C.* § 2106, which reads as follows:

> [a] mortgage, or a conveyance in the nature of a mortgage, of lands or tenements shall have priority according to the time of recording it in the proper office, without respect to the time of its being sealed and delivered, and shall be a lien from the time of recording it *and not before.*[59]

According to the Court of Common Pleas, the phrase "and not before," shows "the statute was crafted specifically to rebut claims like Defendant's which seek to advance the priority of *their* mortgage to a time prior to *its* recording."[60] The Superior Court and the Court of Common Pleas, in my view, misapprehend equitable

---

[56] *E. Sav. Bank*, 55 A.3d at 349.
[57] 25 *Del. C.* § 153.
[58] *E. Sav. Bank*, 2014 WL 3827496, at *4.
[59] 25 *Del. C.* § 2106 (emphasis added).
[60] *CACH, LLC v. E. Sav. Bank, FSB*, No. CPU4-09-009022, at *8 (Del. CCP June 3, 2013) (emphasis added).

subrogation and its interaction with the recording statutes.[61] Eastern is not asserting

or seeking to advance *its* later-filed mortgage. Rather, Eastern seeks to take

advantage of the race recording statute's "first in time, first in line" rule by standing

in the shoes of Wilmington Trust and the other prior senior lien holders, and

exercising *their* "first in time, first in line" priority.[62] In other words, irrespective of

its own admittedly later-filed mortgage lien or even whether it had a mortgage lien,

Eastern seeks to use equitable subrogation to avail itself of the priority of the prior

[61] It appears from the Majority opinion that they too disagree with the Superior Court's analysis of Delaware's recording statutes and an absolute bar on asserting equitable subrogation. The Majority appears to hold that equitable reasons might exist in a given case to apply equitable subrogation regardless of Delaware's recording statutes. *See* Majority Opinion at 13 ("Equitable subrogation has never been used to undercut the authority of a Delaware statute *without equitable cause*. When, as here, there is *no equitable reason to set aside* the provisions of Delaware's pure race recording statute, the rule of 'first in time, first in right' governs the priority of the parties' competing claims.") (emphasis added). This is, of course, not what the Superior Court ruled. Our differences in this Court, therefore, narrow to whether the elements of equitable subrogation have been satisfied in this case.

[62] *See Hicks v. Londre*, 125 P.3d 452, 456 (Colo. 2005) ("Subrogation is defined as 'the substitution of another person in the place of the creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt."); *Eastern Sav. Bank, FSB v. Pappas*, 829 A.2d 953, 962 (D.C. 2003) ("The doctrine is applied where the subrogee effectively stands in the shoes of the original lienholder . . . ."); *Union Bank v. Thrall*, 872 N.E.2d 542, 547 (Ill. App. Ct. 2007) ("This doctrine [of equitable subrogation] is not really an exception to the rule of first in time, first in right. Instead, it simply holds that, under certain circumstances, equity requires that a subsequent lienor be considered the same as if he were the original lienor."); *Elliott v. Tainter*, 93 N.W. 124, 124 (Minn. 1903) (stating that "the true principle" of equitable subrogation is that where a person having interest in real property pays money to satisfy a mortgage or lien to protect his interest "it shall operate in the nature of an assignment of the canceled lien, to continue it in force to subserve the ends of justice"); Note, *Subrogation of Purchaser to Rights of Senior Mortgagee Against Junior Encumbrances*, 48 YALE L.J. 683, 683 (1939) ("Subrogation is the substitution of one person in place of another with reference to a lawful claim or right."); Roger Bernhardt, *Equitable Subrogation: A Sensible Remedy But Don't Count On It*, CEB REAL PROP. L. REP. (Nov. 2012) ("What a court must say to put the refinancer first is that it is entitled to stand in the shoes of the former lender who was refinanced out of the picture.").

refinanced liens. That is a question of meeting the elements of equitable subrogation where a mortgage is being refinanced, not a question of conformity or nonconformity with Delaware's race recording statutes.[63] The question is whether the liens associated with the first in time, first in right prior mortgages and judgments paid off in the refinancing transaction, to use the language of the Court of Chancery in *Stoeckle v. Rosenheim*, "exist[] for the benefit of"[64] Eastern, as the party that paid them off for its own protection. The Superior Court therefore erred as a matter of law when it decided that equitable subrogation is unavailable in Delaware because it conflicts with our recording statutes.

Even though Delaware is a pure race recording jurisdiction, the Delaware courts have not shied away from using equitable subrogation to prevent unjust enrichment in the mortgage refinancing context. Two cases from the Court of Chancery illustrate its broad application, where in the first case the Court of Chancery found that a second-mortgage holder who paid off a first mortgage "had a right to .

---

[63] *Supra* note 30. *See also Weitz Co., LLC v. Heth*, 333 P.3d 23, 25-28 (Ariz. 2014) ("Arizona Revised Statutes § 39-992(A) gives mechanics' liens priority over liens recorded after construction begins on real property. We are asked to decide whether the statute precludes assignment by equitable subrogation of a lien that attached before construction began on the project at issue. We hold that it does not . . . . When equitable subrogation occurs, the superior lien and attendant obligation are not discharged but are instead assigned by operation of law to the one who paid the obligation . . . . Because an equitably subrogated lien 'attaches' when the superior lien was recorded, § 39-992(A) does not require that an intervening mechanics' lien be given priority."); *Citizens State Bank v. Raven Trading Partners, Inc.*, 786 N.W.2d 274, 279 (Minn. 2010) ("Equitable subrogation has a long history in Minnesota and has existed alongside the Minnesota Recording Act.").
[64] *Stoeckle v. Rosenheim*, 87 A. 1006, 1007 (Del. Ch. 1913).

. . be substituted for the [first-mortgage] creditor"[65] in priority, and in the second case, following a mortgage refinancing, "the party that paid off the two previous mortgage balances became subrogated to the rights of the former mortgagees to receive payment from the former mortgagors . . . ."[66]

In *Stoeckle*, the complainants were a brewing company and its president. The brewing company held a second mortgage on the property being foreclosed upon and had also paid off the first mortgage on the property, albeit accidentally and without acquiring assignment of the first mortgage. The defendants were holders of a third mortgage on the property and sought to foreclose and collect.[67] The Court of Chancery found that, "whether assigned or not [the first mortgage] exists for the benefit of [the complainants]."[68]

The Superior Court found *Stoeckle* distinguishable "because the remedy sought there was an injunction; the prevention of a foreclosure sale," whereas in this case, "the applicability of the recording statute is at center stage . . . . "[69] Once again, I believe the Superior Court misapprehends the interaction of the recording statutes with equitable subrogation. Moreover, the Court of Chancery's disposition of

---

[65] *Id.* at 1007.
[66]  *Oldham*, 2003 WL 21786217, at \*5, n. 8.
[67] *Stoeckle*, 87 A. at 1006.
[68] *Id.* at 1007.
[69] *E. Sav. Bank*, 2014 WL 3827496, at \*5.

*Stoeckle* explicitly envisioned the distribution of foreclosure proceeds in accordance with the priority the court recognized the complainants were entitled to as equitable subrogees:

> A preliminary injunction will, therefore, be awarded to the complainants, enjoining further proceedings on the execution until the complainants at least had an opportunity to obtain a decree establishing the first mortgage as a lien, and thereupon obtain an order for the sale of the mortgaged premises, from the proceeds of which sale the mortgage debt of the defendants will be paid by this court if the proceeds of sale be sufficient.[70]

The Court of Common Pleas and the Majority limit *Stoeckle* to the proposition that a first mortgage can be reinstated where it has been satisfied by mistake.[71] That proposition was admittedly a holding in the case. But that holding was without consequence absent the Court of Chancery's separate determination that the plaintiffs, who were not the holders of the first mortgage, were entitled to that mortgage's priority at foreclosure as equitable subrogees.

In *Oldam v. Taylor*,[72] the plaintiff had a half-interest in the property at issue, with the other half-interest owned by defendants. The defendants refinanced two mortgages on the property with a new lender without the plaintiff's participation or

---

[70] *Stoeckle*, 87 A. at 1008; *see also Stoeckle v. Rosenheim*, 95 A. 300, 302 (Del. Ch. 1915).("[T]he Stoeckle Brewing Company is entitled to have reinstated the lien of the first mortgage on the premises for the full amount of the debt and interest thereon, and to recover payment thereof from the mortgaged premises . . . .").

[71] *E. Sav. Bank*, No. CPU4-09-009022, at *8-9; Majority Opinion at 10, 12.

[72] 2003 WL 21786217 (Del. Ch. Aug. 4, 2013).

27

knowledge.[73]  The Court of Chancery found that "the party that paid off the two previous mortgage balances became subrogated to the rights of the former mortgagees to receive payment from the former mortgagors, including [the plaintiff]."[74]

The Superior Court's view, shared by the Majority, that "*Oldham* is better understood as relying on a more general theory of unjust enrichment"[75] than on equitable subrogation, is difficult to square with the *Oldham* court's summary of the argument before it from the mortgage refinancing lender, in whose favor the court decided the case:

> The basis for this argument is that under the doctrine of subrogation, Oldham's liability to pay that previous mortgage debt was shifted from the prior mortgage lenders to [the refinancing lender] when [the refinancing lender] paid those prior mortgage creditors off.  That is, metaphorically speaking, [the refinancing lender] stepped into the shoes of the former mortgage lenders, with the result that after the refinancing, [the plaintiff's] obligation to repay her share of the preexisting mortgages ran to [the refinancing lender].[76]

It is true, as the Superior Court pointed out in its opinion, that the Court of Chancery in *Oldham* did not find that the plaintiff's interest in the property continued to be encumbered by a lien.[77]  There is admittedly some inconsistency between the Court of Chancery's finding in *Oldham* that the equitable subrogee had a right,

---

[73] *Id.* at *1-2.
[74] *Id.* at *5, n.8.
[75] Majority Opinion at 12, n. 27 (quoting the Superior Court's opinion).
[76] *Id.* at *4.
[77] *E. Sav. Bank*, 2014 WL 3827496, at *5.

28

standing in the shoes of the original mortgagees, to repayment from the plaintiff, and the court's description of plaintiff's property interest as "free and clear of any lien or mortgage."[78] Nonetheless, when it came to the question of the existence of a lien, the Court of Chancery's analysis focused on the ability of the refinancing mortgagee, as the holder of its *own* mortgage, to enforce *that* mortgage against the plaintiff, who had not executed *that* mortgage.[79] The Court of Chancery did not focus on whether the refinance mortgagee could, standing in the shoes of the original mortgagees, enforce its right to repayment by way of the original mortgagees' liens, because the outcome was the same:

> the relief granted here will require: 1) a partition sale of the entire property, 2) [the plaintiff] to pay [the defendants], from her share of the sale proceeds, her lawful portion of the paid-off preexisting mortgage balance, and 3) [the defendants], in turn, to transfer [the plaintiff's] mortgage payment to [the refinance lender].[80]

While *Stoeckle* and *Oldham* are not the same as the factual posture of the instant case, the cases do stand for the proposition that equitable subrogation is an available remedy in Delaware and can be used to establish priority in mortgage foreclosure proceedings.

---

[78] *Oldham*, 2003 WL 21786217, at *4.

[79] *See id.* ("One proposition that is indisputable is that the [refinance lender's] mortgage is not enforceable as against [the plaintiff's] one-half interest in the property, because [the plaintiff] never executed that mortgage.").

[80] *Id.* at *5, n.11.

Eastern Has Satisfied All Of The Equitable Subrogation Elements

In *Reserves Development, LLC v. Severn Sav. Bank, FSB*, the Court of Chancery set forth the elements of an equitable subrogation claim:

> 1) payment must have been made by the subrogee to protect his or her own interest; 2) the subrogee must not have acted as a volunteer; 3) the debt paid must have been one for which the subrogee was not primarily liable; 4) the entire debt must have been paid; and 5) subrogation must not work any injustice to the rights of others.[81]

Based on the stipulated facts, Eastern has satisfied each of these elements. Eastern paid off the entire debt of the prior mortgages and judgments to protect its own interest and therefore was not a volunteer.[82] Eastern was also not primarily liable for the prior mortgages and liens satisfied as part of the refinancing, and the prior mortgages and liens were fully paid off through the refinancing. And, as discussed below, subrogation does not work an injustice against CACH.

---

[81] *Reserves Dev.*, 2007 WL 4054231, at *17.

[82] *Han v. United States*, 944 F.2d 526, 530 (9th Cir. 1991) (concluding that the equitable claimants were not volunteers where they paid off the prior obligation "to establish and to protect their own interest, rather than simply to meddle officiously"); *Hicks*, 125 P.3d at 457 ("Suffice it to say that [a] person who lends money to pay off an encumbrance on property and secures the loan with a deed of trust on that property is not a volunteer for purposes of equitable subrogation.") (internal quotation omitted); *Home Owners' Loan Corp. v. Sears, Roebuck & Co.*, 193 A. 769, 772 (Conn. 1937) (lender was not a volunteer where there was an agreement, implied if not express, with the homeowner to use proceeds of the loan to discharge prior mortgages and to grant the lender rights against the property); *Eastern Sav. Bank, FSB v. Pappas*, 829 A.2d 953, 961, n.14 (D.C. 2003) ("This theory that the purchaser is a volunteer is, we think, entitled to little weight. The purchaser is advancing his money intending to get something for it, to wit, a title unencumbered by the lien to be discharged. It is hardly in accord with reality to say that he pays officiously, as an intermeddler.") (quoting *Burgoon v. Lavezzo*, 92 F.2d 726, 732 (D.C. Cir. 1937)); *East Boston Sav. Bank v. Ogan*, 701 N.E.2d 331, 336 (Mass. 1998) ("[The equitable claimants] did not act as 'volunteers' because they purchased the property and mortgaged it at sale.").

The Superior Court did not address the *Reserves Development* elements, because it found equitable subrogation to be unavailable as a matter of law.[83] The Court of Common Pleas did address the elements and determined that Eastern did not satisfy elements one and five.[84] The Court of Common Pleas reasoned that Eastern did not refinance the existing debts to protect its interest because Eastern "had no interest in the property at 19 Sanford Drive at the time it claims to have made a payment."[85] But Eastern was in the process of taking an interest in the property.[86] A refinancing mortgagee is not disinterested in the satisfaction or non-satisfaction of the mortgages being refinanced. To consummate the refinancing, the new mortgagee requires that the mortgage or mortgages being refinanced and any other prior interests on the property be satisfied out of the proceeds of the refinancing to protect the security interest the refinancing mortgagee is taking in the property.[87]

CACH also argued that Eastern fails to meet the first element because Eastern did not pay off the prior mortgages and judgments, the Johnsons did.[88] Eastern did not technically walk the mortgage and lien satisfactions down to the recorder of deeds

---

[83] *E. Sav. Bank*, 2014 WL 3827496, at *4.
[84] *E. Sav. Bank*, No. CPU4-09-009022, at *9-10.
[85] *Id.* at *10.
[86] *See Sourcecorp, Inc. v. Norcutt*, 274 P.3d 1204, 1208 (Ariz. 2014) (finding the equitable claimants "had a sufficient interest to allow them to seek equitable subrogation" because they "paid the pre-existing debt . . . to protect their concurrently acquired interest in the property").
[87] *See Prestance,* 160 P.3d at 25 ("A lender providing funds to pay off an existing mortgage expects to receive the same security as the loan being paid off.").
[88] Answering Br. at 20.

31

office, pay the satisfaction fee, and record the actual satisfactions. But to disregard equitable subrogation based on hypertechnical distinctions hardly suits the equitable nature of the remedy. No doubt Eastern's attorney paid off the prior mortgages and judgments without those proceeds first flowing to the Johnsons, but it would be of little utility to require the actual mortgagee personally to appear at the government office and satisfy existing liens.[89] And the satisfaction of prior mortgages and judgments is generally a condition of refinancing agreements binding on borrowers.[90] Eastern is the *de facto* payer for purposes of equitable subrogation where a mortgage is refinanced, which is enough for equitable subrogation.

The Equities and Injustice

When CACH transferred its judgment to the Superior Court judgment docket, its resulting lien was junior to each of the mortgages and liens already of record against the property. CACH had no right or reasonable expectation that it could jump ahead of the existing liens in a foreclosure proceeding. After the refinancing, CACH was no worse off than before.[91] As a result of the Majority decision, CACH now

---

[89] Reply Br. at 8.

[90] *Id.*; *see also* Sang Jun Yoo, Note, *A Universal Test for the Equitable Subrogation of Mortgages*, 32 Cardozo L. Rev. 2129, 2136 (2011) ("Refinancing mortgagees agree to issue a refinancing mortgage loan on the condition that all prior interests on a property are satisfied by the refinancing mortgage loan in order to secure the protection of being first in priority in case of default.").

[91] Restatement (Third) of Property (Mortgages) § 7.6, cmt. a. *See also Hicks*, 125 P.3d at 457 ("An intervening lienholder is not prejudiced because it occupies the same position it held prior to satisfaction of the preexisting obligation.").

jumps ahead in line. The Majority has conferred on CACH an "unwarranted and unjust windfall" that equitable subrogation exists to prevent.

The Majority has adopted what is essentially a fault-based analysis – if there were mistakes made in the refinancing transaction that cause a lender to lose priority, the remedy is to sue the title insurance company or settlement agent. This fault-based approach "[f]or all practical purposes . . . swallows the doctrine and is widely criticized."[92] "If fault always defeated the doctrine, equitable subrogation would be entirely dead."[93] Negligence on the part of the refinancing lender should only be a counterweight to equitable subrogation when the intervening lienholder has been harmed, which is not the case here.[94]

---

[92] *Prestance*, 160 P.3d at 21. *See also Wells Fargo Bank v. Commonwealth,* 345 S.W.3d 800, 807 (Ky. 2011) ("Some have criticized this approach as obviating the doctrine completely."); McGillivray, *supra* note 20 at 314 ("[T]his approach has been widely criticized for eliminating the doctrine of equitable subrogation entirely and obviating its underlying purpose. Very few courts continue to apply the minority rule because it precludes equitable subrogation in most cases, especially with regard to mortgage refinancing."). Following the Restatement approach obviates the need to assign fault, and instead recognizes that a mortgage refinancing transaction is different where the new lender expects the same priority position of the existing lender, and the intervening lienor has no right to reshuffle the order of senior liens. Restatement (Third) of Property (Mortgages) § 7.6 cmt. e ("Under this Restatement, however, subrogation can be granted even if the payor had actual knowledge of the intervening interest; the payor's notice, actual or constructive, is not necessarily relevant.").

[93] Bernhardt, *supra* note 31.

[94] *See Ex Parte AmSouth Mortg. Co., Inc.*, 679 So.2d 251, 255 (Ala. 1996) ("If all persons who negligently confer an economic benefit upon another are disqualified from equitable relief because of their negligence, then the law of restitution, which was conceived in order to prevent unjust enrichment, would be of little or no value."); *Aurora Loan Servs., LLC v. Senchuk*, 36 So.3d 716, 729 (Fla. Dist. Ct. App. 2010) ("[E]quitable subrogation will be applied to relieve negligence, where the position of the original junior lienors will be no worse than before the first mortgage was satisfied.") (quoting *Suntrust Bank v. Riverside Nat. Bank of Florida*, 792 So. 2d 1222, 1224-25 (Fla. Dist. Ct. App. 2001)); *Prestance*, 160 P.3d at 27 ("When we are dealing with refinancing, as opposed

The Majority finds that CACH suffered prejudice because Eastern refinanced the existing loan in an amount greater than required to satisfy the existing mortgages and liens. The record is unclear whether some or all of the excess amount was necessary to cover the refinancing transaction costs. In any event, unlike a mortgage, which secures a note for the property and is not implicated until a default occurs, CACH had the immediate right to collect on its judgment, and did not have to suffer any or at worst minimal prejudice while engaging in the foreclosure process. As other courts have held, prejudice is reviewed at the time of foreclosure, not at the time of refinancing.[95] CACH is protected from prejudice during foreclosure because the new lender's equitable subrogation claim is limited to the amount of the refinanced liens plus associated costs.[96]

Finally, the Majority holds that CACH did not bargain for its subordinate position, pointing to cases where the intervening lienholder was another mortgage lender who had agreed when lending money to be junior to other lenders. According to the Majority, in the absence of bargaining, CACH will not receive an

---

to mistakes, there is no reason to consider the subrogee's knowledge of intervening interests."). *See also* Nelson & Whitman, *supra* note 18 at 315-16 ("We have vigorously criticized this approach and find it impossible to understand in light of the fact that subrogation in this situation harms no one, leaving the intervening lien exactly where it started. In contrast, refusal to grant subrogation gives the intervening lienor an unexpected, unearned, and unwarranted promotion in priority.").

[95] *Senchuk*, 36 So. 3d at 721-22.

[96] As noted in the Restatement, there is no right of subrogation with respect to any excess funds, meaning Eastern would only be entitled to subrogation for the amounts due under the mortgages and liens it paid off. Restatement (Third) of Property (Mortgages) § 7.6 cmt. e.

unearned windfall by jumping ahead of Eastern. But the relevant inquiry under the *Reserves Development* factors is whether subrogation works any injustice to the rights of others.[97] CACH's right was the same, whether it was bargained for or not. It was a right to a position subordinate to that of the existing liens with priority over junior liens. That right remains precisely what it was before Eastern, to protect its interest and not to advance CACH's interest, paid off the senior debt.

Conclusion

The record shows "that proceeds from Eastern's mortgage were used to pay off a prior mortgage on the property."[98] Eastern has satisfied the elements required for equitable subrogation. The doctrine has been recognized and applied in Delaware, and sound consumer-friendly and lender-friendly policy reasons support its application. This Court should reverse the Superior Court's judgment and remand to the Superior Court to remand to the Court of Common Pleas for entry of an order of summary judgment in favor of Eastern. I respectfully dissent.

---

[97] *Reserves Dev.*, 2007 WL 4054231, at *17 (emphasis added).
[98] *E. Sav. Bank*, 55 A.3d at 351.