EASTERN STATES PETROLEUM CO., INC., a Delaware corporation,

*vs.*

UNIVERSAL OIL PRODUCTS COMPANY, a Delaware corporation.

*New Castle, September 13, 1945.*

*Arthur G. Logan,* for complainant.

*Clarence A. Southerland,* of the firm of Southerland, Berl & Potter, (Ralph S. Harris and Frederick W. P. Lorenzen, both of New York City, of counsel), for defendant.

HARRINGTON, Chancellor: The demurrer is interposed on the ground that the bill of complaint does not allege facts which give the complainant the right to any equitable relief; and that, by reason of lapse of time in excess of the limitation provided for analogous actions at law, the complainant is now barred from obtaining relief.

The bill, in substance, alleges that Universal Oil Products Company is engaged in the business of acquiring and exploiting patents, and has acquired a number of patents dealing with the art of cracking crude oil for the purpose of producing from that substance the lighter derivative products, such as gasoline; that prior to 1935 both patented and unpatented methods for cracking oil had been developed; that Universal Oil Products Company had developed and owned the patented Dubbs process and another company had developed the unpatented Winkler-Koch process; that persons or corporations desiring to build oil refineries could, therefore, design and build cracking plants to operate either under a patented and license process or under an unpatented process; that in 1935 Universal, nevertheless, advised the oil industry that no oil cracking plant could be built in the United States without using one or more of its patents and acquiring a license therefor; that in the spring of that year, Eastern States Petroleum Co., Inc. desired to add a

cracking plant to its refinery in Houston, Texas, and decided to build an unlicensed plant of the Winkler-Koch type; that Universal, having ascertained Eastern's intention, urged it to take a license from Universal, regardless of the type of plant which Eastern intended to build, and regardless of which contractor should erect the plant; that by letter dated July 3rd, 1935 Universal pointed out that in a suit instituted by it against a user of the Winkler-Koch process, the United States District Court for the District of Delaware had handed down a decision holding that the Universal patents were valid and were infringed by the use of the Winkler-Koch process, 6 *F. Supp.* 763; that in the same letter it also pointed out that the United States Circuit Court of Appeals for the Third Circuit had affirmed the District Court's decision, and enclosed a copy of the printed opinion which will hereafter be referred to as the *"Root case,"* 78 *F. 2d* 991; that thereafter Universal continued to "threaten" Eastern with an infringement suit, based upon the decision of the Circuit Court of Appeals in the *Root* case, unless Eastern would take a Universal license to conduct the operations of its contemplated oil cracking plant; that on August 9, 1935 Universal again sent to Eastern a copy of the opinion in the *Root* case with the statement that it had been "rendered by the United States Circuit Court of Appeals," that on October 21st, 1935, the Supreme Court of the United States denied *certiorari* in the *Root* case, 296 *U.S.* 626, 56 *S. Ct.* 149, 80 *L. Ed.* 445; that Universal also circularized the entire oil industry concerning the decision of the Circuit Court of Appeals in that case; that at this time Eastern found that unless it took a license from Universal it could not secure certain contemplated financing for the construction of its oil cracking plant because of the fact that Universal had obtained a favorable decision in the *Root* case, and had threatened operators of cracking plants with suit unless licenses were obtained.

The bill then alleges that "Eastern States was induced to and did take a license from Universal on December 19th,

1935, due to the threat of suit made as aforesaid" and due to the general circularizing of the industry by Universal with respect to the decision in the *Root* case; that after the license had been obtained, Eastern caused its cracking plant to be designed and built, and upon the suggestion of Universal it was designed with a separate reaction chamber, at an additional expense to Eastern; that when the new cracking plant was ultimately put into operation, the "performance was not satisfactory," and on March 19th, 1937, Eastern notified Universal that it considered the license agreement, theretofore entered into on December 19th, 1935, cancelled *"ab initio";* that Eastern, at considerable cost, thereupon removed the separate reaction chamber and operated its plant as originally contemplated; that Universal took the position that the license agreement could not be cancelled; that royalties thereunder, in the sum of $141,-403.13, were due to Universal for the period from May, 1936, to March 1st, 1937; that Eastern States refused to pay the royalties and Universal, in order to enforce its claim, filed suit under the license agreement in the Superior Court of the State of Delaware, for New Castle County, at the May Term 1937; that Eastern countered by filing a bill in equity charging that the license agreement had been entered into by it as a result of false and fraudulent representations by Universal, relating to the yields of gasoline obtainable by one operating under a Universal license, and sought its cancellation on that ground; that Universal filed a cross-bill for the collection of its royalties, and the controversy was referred to a special master who, on June 27th, 1940, decided it entirely in favor of Universal; that the special master found, among other things, that any difficulties inherent in the operations of Eastern's plant were due to the fact that Eastern did not conform to Universal's representations with respect to the design and specifications of the plant; that the special master recommended that Eastern's bill be dismissed and stated that he would proceed to determine the amount of royalties due and owing to

Universal under the license agreement; that at this point a settlement was reached growing out of the following events: On December 9th, 1938 Eastern had brought an action in the District Court of the United States for the Southern District of New York against Asiatic Petroleum Corporation, Shell Union Oil Corporation and others, 27 *F. Supp.* 121, alleging a violation of the Federal anti-trust laws; that by the amended and supplemental complaint in that action the plaintiff sought to recover three-fold damages which it alleged amounted to $2,602,917.54; that after the special master had rendered his decision in the Delaware suit, involving the Universal license, "negotiations were had between Eastern States on the one hand and Universal and the defendants in the New York anti-trust case on the other, which resulted in a settlement of both the New York anti-trust case and the action in this court" (relating to the Universal license agreement) ; that the settlement agreement was between (1) Eastern States Petroleum Co., Inc., (2) Universal Oil Products Company, and (3) Shell Union Oil Corporation and Asiatic Petroleum Corporation, the defendants in the New York anti-trust suit; that this settlement embodied the following provisions: (1) Eastern States released Asiatic Petroleum Corporation and its alleged co-conspirators in the New York anti-trust suit from all liability with respect to the matters complained of in that action and discontinued the suit; (2) Asiatic Petroleum Corporation delivered to Universal for cancellation, without payment, $250,000 of Universal's sealed promissory notes; (3) Universal released and discharged Eastern from all liability under the original license agreement entered into on December 19, 1935 to the date of the settlement agreement, September 1, 1940, and agreed to withdraw its cross-bill in the Delaware Chancery proceeding and to discontinue its action for royalties in the Superior Court for New Castle County; (4) Universal granted to Eastern a standard form license providing for royalties under certain of its patents, and at the same time Eastern issued to Universal a fully

paid license under a patent owned by Eastern; (5) Eastern agreed to and did permit Universal to inspect its plant to determine whether the Eastern process infringed any other patents owned by Universal. The settlement agreement also provided that if Universal claimed additional infringements, and Eastern did not agree, that the matter should then be submitted to arbitration.

The bill further alleges that Universal treated the surrender of notes by Asiatic Petroleum Corporation as the payment of royalties by Eastern in the sum of $141,403.13, the amount demanded by Universal in the Delaware litigation, and the balance of $108,596.87 was treated as satisfying Universal's claim against Eastern for royalties from the date of the commencement of the Delaware litigation in 1937 to the date of the general settlement agreement of September 1, 1940; that the settlement agreement, as well as the original license agreement of December 19, 1935, was entered into by Eastern "in the belief that the decision rendered by Judge Davis (for the Circuit Court of Appeals) in the *Root Refining Company* case, which Universal had used as the basis of its threat to sue Eastern States for infringement in the event it built a cracking plant and did not take a license from Universal, had been a proper and honest decision"; that "Eastern States had no occasion prior to the spring of 1941 to suspect said decision as being corrupt"; that "in the spring of 1941 your orator ascertained certain facts which caused it to believe that said decision had been obtained by Universal through fraud, corruption, obstruction or distortion of justice, and that by virtue thereof Universal was accountable to Eastern States for the damage occasioned to Eastern States through the use by Universal of said decision to induce Eastern States to enter into the license agreement * * * as aforesaid"; that shortly prior to June 25th, 1941 three individuals, acting as *amici curiae,* filed a petition setting forth facts "indicating that the decision by Judge Davis had been obtained by fraud and corruption"; that

this petition, which prayed for a judicial investigation, was joined in by Arthur G. Logan, the complainant's solicitor, as an *amicus;* that the intervention by Mr. Logan was at the instruction of Eastern; that the investigation thus instituted was referred to a special master who, after extensive hearings, decided that the decision in the *Root* case had been obtained through "such fraud as tainted and invalidated the judgment," and on June 15th, 1944 the Circuit Court of Appeals adopted this conclusion.

The bill also alleges that at the time the *amici* proceedings were brought in the *Root* case, in the spring of 1941, another patent infringement suit brought by Universal against Globe Oil & Refining Company was pending in the United States District Court for the Northern District of Illinois, 40 *F. Supp.* 575; that this suit also involved the Winkler-Koch type of cracking plant; that the court held that that process did not infringe the Dubbs process patent, and this determination was ultimately affirmed by the United States Supreme Court; that the decision in the *Globe* case, 322 *U.S.* 471, 64 *S. Ct.* 1110, 88 *L. Ed.* 1399, together with the decision of the arbitrators in the Universal-Eastern arbitration, indicate that at no time "but for the fraud practiced on Eastern States by Universal" would Eastern have been liable for royalties, or any claim, based on patent infringement; that, but for the alleged fraud practiced upon Eastern by Universal, the license agreement of December 19, 1935 would not have been entered into, the settlement agreement of September 1, 1940 would not have been made, and the arbitration, pursuant thereto, would not have been carried out. That Eastern was damaged and Universal profited as a result of the alleged fraud in the following respects:

(1) Eastern added a separate reaction chamber to its plant in 1935;

(2) Eastern was required to expend approximately $200,000 in defending itself against claims of Universal

based on the license agreement, the settlement agreement and the arbitration thereunder;

(3) Eastern surrendered its claim, in excess of $2,-000,000, for damages in the anti-trust suit pending in New York in order to obtain a release and discharge of Universal's claims;

(4) As a result of the settlement agreement, Universal obtained a discharge of $250,000 of the sealed promissory notes held by Asiatic.

The relief sought by the special prayers is: (a) That Universal be "required to account to and pay unto" Eastern "all damages suffered" by Eastern by virtue of the execution of the license agreement on December 19, 1935, "including the value of the anti-trust suit" which Eastern had against Asiatic Petroleum Corporation and others, but which was released by the settlement agreement of September 1, 1940; (b) that the license agreement of September 1, 1940, whereby Eastern States Petroleum Corporation granted to Universal Oil Products a paid up license under a specified United States letters patent, be cancelled and Universal Oil Products Corporation be required to account to and pay unto Eastern States Petroleum Co., Inc. all profits and advantages received by it thereunder; and (c) that Universal Oil Products Company, in effect, be required to restore the $250,000 of sealed promissory notes surrendered to it by Asiatic Petroleum Corporation so that Eastern States might in turn become subrogated to the original position of Asiatic and enforce the notes which were cancelled under the September 1, 1940 settlement agreement.

The defendant's primary contention is that the complainant's rights can only be litigated in an action at law sounding in fraud and deceit and that a prayer for an accounting does not change that rule. *Cochran v. F. H. Smith Co., 20 Del. Ch.* 159, 174 *A.* 119; *Fryberger v. Consolidated Electric & Gas Co., 22 Del. Ch.* 357, 7 *A.* 2d 211.

Eastern States bases its asserted primary right to relief in this court solely on the ground that it is entitled to be subrogated to the original position of Asiatic Petroleum Corporation against Universal, and claims that the other special prayers are merely of an incidental nature and in order that the entire controversy may be determined in one action.

Subrogation is an equitable remedy originally borrowed from the civil law, and its application ordinarily depends upon the principles of equity and justice rather than upon any semblance of contract rights. *Leiter v. Carpenter*, 26 *Del. Ch.* 85, 22 *A.* 2d 393; *Hackensack Brick Co. v. Borough of Bogota*, 86 *N. J. Eq.* 143, 97 *A.* 725; *Bater v. Cleaver*, 114 *N. J. L.* 346, 176 *A.* 889. When that remedy is applicable, a debt, extinguished at law by payment made by a person not bound thereby, is treated in equity as still subsisting for his benefit. *Leiter v. Carpenter, supra; Aetna Life Ins. Co. v. Town of Middleport*, 124 *U.S.* 534, 8 *S. Ct.* 625, 31 *L. Ed.* 537. Legal subrogation is, therefore, the equitable "substitution of another person in the place of the creditor to whose rights he succeeds in relation to the debt paid." *Leiter v. Carpenter, supra; Aetna Life Ins. Co. v. Middleport, supra*. The remedy is based on the theory that somewhat the same equity operates which seeks to prevent the unjust enrichment of one person at the expense of another by permitting actions for reimbursement, contribution and exoneration, and in appropriate cases creates a relation somewhat analogous to a constructive trust. *Leiter v. Carpenter, supra; Camden Trust Co. v. Cramer*, 136 *N. J. Eq.* 261, 40 *A.* 2d 601; *Knauth v. Knight*, (5 *Cir.*) 255 *F.* 677; *Berry v. Stigail*, 253 *Mo.* 690, 162 *S.W.* 126, 50 *L. R. A.*, (*N.S.*) 489, *Ann. Cas.* 1915C, 118; 5 *Pomeroy Eq. Jur.*, (4th ed.) §§ 2343, 2349. But one who pays the debt of another upon his own initiative, and without invitation, compulsion or the necessity for self-protection, is usually regarded as a mere volunteer without any standing in equity and cannot rely on subrogation. 5 *Pomeroy, supra*, §§ 2344-2349; *Shel-*

*don on Subrogation,* (2d ed.) 23. Originally, that remedy might have been largely confined to cases involving the relation of principal and surety, but it now has a much broader application; and when right and justice demand it the tendency is to extend, rather than to restrict, its application. *Bater v. Cleaver, supra.* One who pays the debt of another at his direct or indirect request is, therefore, usually entitled to subrogation. *Schmid v. First Camden Nat. Bank & Trust Co.,* 130 *N. J. Eq.* 254, 22 *A.* 2d 246; *Bater v. Cleaver, supra; Home Sav. Bank, et al., v. Bierstadt,* 168 *Ill.* 618, 48 *N.E.* 161, 61 *Am. St. Rep.* 146; 5 *Pomeroy, supra,* §§ 2344, 2347. Under such circumstances, a mere contract action at law on an implied promise would not, necessarily, give adequate relief. *Leiter v. Carpenter, supra;* 5 *Pomeroy, supra,* § 2347. Moreover, one who is induced by fraud to pay the debt of another is, ordinarily, not a mere volunteer, and may rely on subrogation. *Ramey v. Cage,* (*Tex. Civ. App.*) 90 *S.W.* 2d 626; *Bolman v. Lohman,* 74 *Ala.* 507; *Volker v. Fisk, et al.,* 75 *N. J. Eq.* 497, 72 *A.* 1011; *Restatement Law of Restit.,* § 162 *g., illust.* 8.

The distinction between conventional and legal subrogation need not be considered.

The demurrer admits: (1) That the license agreement of December 19, 1935 was procured by Universal's fraudulent representations; (2) the negotiations followed by the three party settlement agreement, whereby Eastern States gave up and agreed to discontinue a pending suit for unliquidated damages against Asiatic Petroleum Corporation and another in which the pleadings charged a violation of the anti-trust law, and damages in excess of $2,000,000; Asiatic Petroleum Corporation surrendered to Universal for cancellation $250,000, principal debt, of Universal's sealed notes; Universal gave up and agreed to discontinue its pending actions against Eastern States for the recovery of the unpaid royalties claimed to be due under the license agreement of 1935, and Eastern States and Universal ex-

changed certain licenses to use patent rights without the payment of any royalties therefor; (3) that "Eastern States surrendered and released its claim against Asiatic Petroleum Corporation for three-fold damages * * * in order to obtain a release and discharge from the claims for royalties Universal asserted against it for the period up to December 1, 1940 which, based upon the first ten months' operations, were in excess of $700,000"; and (4) that "Asiatic Petroleum Corporation paid Universal $250,000 by delivering to it for cancellation certain of Universal's outstanding sealed promissory notes in the principal amount of $250,000. Universal treated said payment of $250,000 on its books as though received from Eastern States in that $141,403.13 was set up as payment for the royalties with respect to which it had brought suit as aforesaid for the period from May 1936 to March 1st, 1937, and the balance of $108,596.87 was set up in satisfaction of Universal's claim against Eastern States for royalties or for infringement for the period from March 1st, 1937 to September 1, 1940."

Universal claims: (1) That it does not appear from the bill that Eastern's alleged right of action against Asiatic was used to pay Universal's debt of $250,000 to Asiatic, but on the contrary that Eastern merely paid its own debt to Universal; and (2) the most complainant alleges is that "a payment made by Asiatic to Universal was treated by. Universal as a payment of royalties due from Eastern to Universal", so if there is "any remote basis for the application of the doctrine of subrogation it is that Asiatic, having paid Eastern's debt to Universal, might be subrogated to the position of Eastern against Universal."

As we have seen, the contract of September 1, 1940, among other things, accomplished two purposes:

(1) The settlement of Eastern's suit against Asiatic; and

(2) The settlement of Universal's suit against East-

ern for unpaid royalties under the December 19, 1935 agreement.

No money passed but, by the terms of the agreement, Asiatic paid directly to Universal $250,000 by the surrender of Universal's outstanding sealed notes for that amount. Eastern States says the reasonable inference from the contract is that the amount so paid was measured by its settlement with Asiatic and, in effect, was made with its property. It argues that its assets were used to pay Universal's debt to Asiatic and at Universal's request; and that Eastern should be subrogated to the original rights of Asiatic against Universal on the surrendered notes. Universal benefited by the settlement to the extent of $250,000, but the contract does not justify the conclusion that Eastern's assets were used to pay Universal's debt. If it did, a request for such payment might be implied, *Bater v. Cleaver, et al., supra;* but the real essential element of the remedy invoked is lacking. The controversy between Universal and Eastern for alleged unpaid license fees was, also, settled by the 1940 agreement, and, notwithstanding the indirect method adopted, the transaction must be regarded as though Asiatic had paid Eastern and Eastern had then paid Universal. Moreover, the bill specifically states that the settlement of Eastern's suit against Asiatic was in order to bring about a release and discharge of Universal's action against Eastern States. Apparently, the surrender by Asiatic of Universal's notes, though pursuant to the agreement of all parties, was merely a convenient method of payment and obviated the necessity for the use of cash in order that both settlements might be carried out. The obvious substantive result of the transaction is that Eastern's assets, derived from the Asiatic settlement, were used to pay its own supposed debt to Universal. The allegation with respect to Universal's book entries is not inconsistent with this construction of the settlement contract. Subrogation does not apply when a complainant merely pays his own debt, and not the debt of another, though incidental benefits may

thereby accrue to the defendant. *Pathe Exchange v. Bray Pictures Corporation,* 231 *App. Div.* 465, 247 *N.Y.S.* 476; *Aetna Life Ins. Co. v. Town of Middleport,* 124 *U.S.* 534, 8 *S. Ct.* 625, 31 *L. Ed.* 537.

In these circumstances the fact that Universal's fraud in procuring the license agreement of December 19, 1935, enabled it to assert a claim against Eastern that was without any real consideration does not justify subrogation.

It is unnecessary to consider the defendant's argument that, in any event, it would be inequitable to apply the remedy of subrogation if it would result in a partial rescission of the very transaction for which damages are being sought by the complainant. See *Hegarty v. American Commonwealths Power Corporation,* 19 *Del. Ch.* 86, 163 *A.* 616.

The demurrer is sustained, and an order will be entered accordingly.