# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PATRICK E. MEYERS et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 9878-VCL |
| | ) | |
| QUIZ-DIA LLC et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| QUIZ-DIA LLC et al., | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROCKFORD MANAGER LLC et al., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 18, 2018
Date Decided: March 16, 2018

John T. Dorsey, Richard J. Thomas, Emily V. Burton, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Bruce S. Bennett, Christopher Lovrien, JONES DAY, Los Angeles, CA; *Attorneys for Plaintiffs*.

Blake Rohrbacher, Susan M. Hannigan, Elizabeth A. DeFelice, Brian F. Morris, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; *Attorneys for Defendants*.

**LASTER, V.C.**

In an opinion dated June 6, 2017,[1] this court granted summary judgment in favor of Greg MacDonald and Dennis Smythe, holding that they were entitled to indemnification from defendants Quizmark LLC and QCE Gift Card LLC (together, the "Subs") for losses they incurred defending against claims filed against them in Colorado federal court (the "Colorado Federal Action"). The Entitlement Decision did not quantify the amount of the indemnification award. Instead, the decision instructed the parties to confer and stated that if they could not agree, then MacDonald and Smythe could make an application pursuant to Court of Chancery Rule 88.[2] The parties could not agree.

MacDonald and Smythe filed the pending motion to quantify the amount of their indemnification award. They are not the only movants. To date, Consumer Capital Partners LLC ("Consumer Capital") has paid all of MacDonald and Smythe's expenses. Consumer Capital seeks to recover those amounts from the Subs, claiming it is entitled to assert, by way of subrogation, the indemnification rights held by MacDonald and Smythe.

This decision holds that Consumer Capital can recover $145,571.86 for the expenses it paid for the defense of the claims asserted in the Colorado Federal Action.[3] Pre- and post-

---

[1] *Meyers v. Quiz-DIA LLC*, 2017 WL 2438328 (Del. Ch. June 6, 2017) (the "Entitlement Decision").

[2] *Id.* at *9.

[3] This decision uses the term "expenses" to refer collectively both to attorneys' fees and amounts paid out of pocket that might be referred to more traditionally and colloquially as expenses. This is how Section 145 of the Delaware General Corporation Law deploys the term. *See, e.g.*, 8 *Del. C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement

1

judgment interest on the expenses shall accrue from August 21, 2015. This decision awards

Consumer Capital $125,000 in fees-on-fees for funding this enforcement action. Pre- and

post-judgment interest on the fees-on-fees shall accrue from August 30, 2017.

## I. FACTUAL BACKGROUND

The facts are drawn from the Entitlement Decision and the parties' submissions in

connection with the Rule 88 application. The Entitlement Decision ruled on cross motions

for summary judgment where the parties did not identify any material disputes of fact. The

cross motions therefore were deemed "the equivalent of a stipulation for decision on the

merits based on the record submitted with the motions."[4] Consequently, the facts recited in

the Entitlement Decision represent factual findings for purposes of the case.

### A. The Parties

At the time of the events giving rise to this decision, QCE LLC ("OpCo") was the

primary operating entity for the Quiznos sandwich shop empire. The Subs were

subsidiaries of OpCo. Quizmark was a Delaware limited liability company. QCE Gift Card

---

actually and reasonably incurred"); *id.* § 145(b) (authorizing a corporation in a proceeding brought by or in the right of the corporation to provide indemnification "against expenses including attorneys' fees) actually and reasonably incurred"); *id.* § 145(c) (mandating corporation to indemnify a director or officer who was successful on the merits or otherwise in defending a proceeding "against expenses (including attorneys' fees) actually and reasonably incurred"). The out-of-pocket expenses encompassed by Section 145 are broader than the restricted concept of "costs" in the statute that authorizes the recovery of court costs in the Court of Chancery. *See* 10 *Del. C.* § 5106; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686–88 (Del. 2013).

[4] Entitlement Decision, 2017 WL 2438328, at *1 (internal quotation marks omitted) (quoting Ct. Ch. R. 56(h)).

was an Arizona limited liability company. Both Subs had operating agreements that granted their officers a right to mandatory indemnification.

MacDonald was the Chief Executive Officer of OpCo. Smythe was the Chief Financial Officer of OpCo. MacDonald and Smythe were also officers of the Subs.

Consumer Capital is a Delaware limited liability company controlled by Richard E. Schaden and Richard F. Schaden. Before the restructuring discussed in this decision, the Schadens beneficially owned a 51% interest in the Quiznos family of companies.

## B.    The Threatened Claims

In 2006, Quiznos engaged in a leveraged recapitalization. To fund the transaction, OpCo borrowed a total of $875 million. OpCo subsequently suffered financial reversals.

By 2012, various funds affiliated with Avenue Capital Management II, L.P. and Fortress Investment Group LLC (the "Funds") had accumulated a substantial position in OpCo's debt. Their holdings gave them the power to declare a default under OpCo's loan agreements and pursue remedies as creditors. To neutralize that threat, Quiznos entered into a complex out-of-court restructuring with its creditors (the "Restructuring"). In practical terms, the Restructuring transferred ultimate ownership of Quiznos and its subsidiaries, including the Subs, to the Funds.

In July 2012, MacDonald and Smythe left Quiznos. In summer 2013, the Funds asked MacDonald and Smythe to attend meetings with Fund representatives in New York City and Denver. Suspecting that the Funds were contemplating litigation, MacDonald and Smythe retained Jones Day to investigate potential claims that the Funds might pursue. At the meetings, the Funds interrogated MacDonald and Smythe about the Restructuring,

3

expressed frustration with the Restructuring and Quiznos' post-transaction performance, and disclosed their intention to file a lawsuit.

## C.     The OpCo Bankruptcy

On March 14, 2014, OpCo and a number of its affiliates—but not the Subs—filed for bankruptcy. Their filings disclosed that "[t]he Reorganized Debtors [and the Funds] w[ould] enter into [a] Specified Litigation Agreement" to pursue "Specified Litigation Claims" against various individuals, including MacDonald and Smythe.[5] The plan of reorganization defined the term "Specified Litigation Claims" as encompassing "all claims and causes of action made, or which could be made, on behalf of the Debtors [or the Funds] against" the named individuals.[6] An exhibit to the plan stated that the Funds intended to pursue "any claims and rights they or their affiliates may have against former management and former owners of the Company relating to the [Restructuring] and any forecasts, projections, models, representations, or warranties made or provided in connection therewith . . . ."[7]

As originally proposed, the plan sought to limit the ability of former officers like MacDonald and Smythe to defend against the litigation that the Funds had threatened by constraining their ability to assert counterclaims or setoffs. The plan sought to achieve this end by discharging and enjoining the former officers from asserting counterclaims based

---

[5] Dkt. 173 Ex. O, at 8.

[6] Dkt. 226 Ex. 1, § 1.156.

[7] Dkt. 173 Ex. O, at 207.

4

on pre-petition events or claiming setoffs for pre-petition amounts in any future litigation with the debtors.[8] The plan also sought to permanently enjoin former officers from asserting counterclaims or claiming setoffs in any litigation with former Quiznos entities or their equity holders and affiliates, *including the Funds and Subs*, which were included in the definition of "Released Party."[9] As originally drafted, the plan also included provisions that would broadly exculpate non-fiduciaries, including the Funds.[10]

In addition, the plan originally sought to subordinate any claims by former officers like MacDonald and Smythe, including indemnity claims, to the rights of Quiznos' unsecured creditors.[11] Because the unsecured creditors were not paid in full under the plan, the plan proposed to discharge the subordinated claims and prohibit them from being asserted against both debtors and non-debtors, including the Funds.[12]

If these provisions had remained in the plan, then they would have significantly prejudiced the ability of former officers like MacDonald and Smythe to respond to and defend themselves against litigation brought by the Funds, such as the threatened claims involving the Restructuring. The provisions would have prevented MacDonald and Smythe

---

[8] Dkt. 226 Ex. 1, §§ 9.1 & 9.2.

[9] *Id.* §§ 1.106, 1.126, & 9.2(b).

[10] *See* Dkt. 226 Ex. 2, at 4, 36-37.

[11] *Id.* at 3-4, 14-16.

[12] *Id.* at 3-4, 14-16, 33-37.

from asserting counterclaims or claiming setoffs against the Funds and functionally eliminated their indemnification rights.

To protect their rights, MacDonald and Smythe had Jones Day filed proofs of claims in the bankruptcy proceeding. They also filed objections to the plan. The parties negotiated a revised plan that removed the subordination provision, preserved MacDonald and Smythe's indemnification rights against non-debtors, and made other changes favorable to MacDonald and Smythe.[13]

## D.    Litigation Between The Parties

On July 1, 2014, MacDonald, Smythe, and other former officers of Quiznos demanded advancement and indemnification from the Subs based on the imminent threat of suit by OpCo and the Funds.[14] The letter sought advancement and indemnification under what the parties have referred to as the "Assignment Agreement." The letter asked the Subs to "respond within 10 days."[15]

On July 10, 2014, just before the ten-day period expired, MacDonald, Smythe, and other officers of Quiznos filed this lawsuit in which they sought to establish their rights to indemnification and advancement under the Assignment Agreement. The parties refer to the claims seeking indemnification and advancement under the Assignment Agreement as the "Assignment Agreement Claims."

---

[13] Dkt. 226 Ex. 3, §§ 1.167, 5.54, 9.76, 9.78.

[14] *Id.* Ex. 10.

[15] *Id.* at 2.

6

On July 22, 2014, the Funds filed the Colorado Federal Action in the United States District Court for the District of Colorado (the "Colorado Federal Court"). The complaint alleged that MacDonald, Smythe, and other former officers of Quiznos had induced the Funds to participate in the Restructuring by creating financial projections that "made it appear that the debt burden and capital structure that would remain in place post-[Restructuring] would be sustainable and appropriate."[16] The complaint also alleged that the projections were false or misleading. The Funds asserted claims for violations of the federal securities laws and common law fraud. Although the complaint in the Colorado Federal Action named multiple defendants, it focused primarily on MacDonald and Smythe. It asserted claims for secondary liability against the other defendants.

The defendants in the Colorado Federal Action moved to dismiss the lawsuit on various grounds. Meanwhile, in this action, I denied the Subs' motion to dismiss the plaintiffs' claims.[17] The parties proceeded with discovery. During that process, the plaintiffs obtained copies of the Subs' operating agreements and determined that those documents provided MacDonald and Smythe with advancement and indemnification rights.

In letters dated August 21, 2015, MacDonald and Smythe demanded advancement and indemnification under the Subs' operating agreements. In September 2015, the

---

[16] Dkt. 165 Ex. 45, ¶ 65.

[17] Dkt. 30.

plaintiffs amended their complaint to add claims under the Subs' operating agreements.[18] The parties refer to the claims seeking indemnification and advancement under the Subs' operating agreements as the "Operating Agreement Claims."

On September 17, 2015, the Colorado Federal Court dismissed the Colorado Federal Action. The court did not dismiss the action on the merits, but rather held that federal jurisdiction did not exist because the claims did not fall within the scope of the Securities Exchange Act of 1934. The Funds appealed the ruling to the United States Court of Appeals for the Tenth Circuit.

Consumer Capital had been paying the expenses that MacDonald, Smythe, and the other defendants were incurring in the Colorado Federal Action. In December 2015, the plaintiffs in this action amended their complaint for a second time.[19] In this pleading, Consumer Capital joined as an additional plaintiff and asserted claims for subrogation. In May 2016, the plaintiffs amended their complaint for a third time. This amendment dropped certain claims and added counts seeking indemnification and advancement under MacDonald and Smythe's employment agreements. Consistent with other labels, this decision calls these counts the "Employment Agreement Claims."

In July 2016, the parties in this action cross-moved for summary judgment. After briefing and argument, I issued a ruling dated November 30, 2016, that dismissed the

---

[18] *See* Dkt. 73.

[19] *See* Dkt. 97.

plaintiffs' claims for indemnification as premature pending the final disposition of the Colorado Federal Action.[20] I issued a ruling dated December 2, 2016, that stayed the Employment Agreement Claims in favor of arbitration.[21] In a ruling dated January 9, 2017, I granted summary judgment in favor of the defendants on the Assignment Agreement Claims.[22] As a result of these rulings, the only claims remaining in this action were the Operating Agreement Claims asserted by MacDonald and Smythe.

Meanwhile, on December 13, 2016, the United States Court of Appeals for the Tenth Circuit affirmed the Colorado Federal Court's order dismissing the Colorado Federal Action. The plaintiffs moved to vacate my order that dismissed their claims for indemnification as premature, arguing that the appellate decision constituted a final disposition. The defendants argued that it was still possible for them to seek certiorari. Whether a pending opportunity to seek certiorari rendered a decision non-final for purposes of indemnification presented an interesting legal issue, but because there was only a short time remaining before the deadline for seeking certiorari would pass, I stayed further proceedings on the Operating Agreement Claims until it was known whether or not the Funds had sought certiorari.[23]

---

[20] *See* Dkt. 200.

[21] *See Meyers v. Quiz-Dia LLC*, 2016 WL 7048783, at *4 (Del. Ch. Dec. 2, 2016).

[22] *See Meyers v. Quiz-Dia LLC*, 2017 WL 7048783, at *18 (Del. Ch. Jan. 9, 2017).

[23] *See Meyers v. Quiz-Dia LLC*, 2017 WL 87060, at *3 (Del. Ch. Jan. 10, 2017).

9

In March 2017, the deadline passed without the Funds seeking certiorari. As a result, the dismissal of the Colorado Federal Action became indisputably final.[24] This development meant that the claims for advancement under the Operating Agreements were moot while the claims for indemnification were now ripe. The parties agreed to provide supplemental briefing on the indemnification issues.[25]

On July 7, 2017, I issued the Entitlement Decision, which held that MacDonald and Smythe were entitled to mandatory indemnification from the Subs "for the amounts they incurred preparing for and defending the Colorado [Federal] Action."[26] The Entitlement Decision did not address Consumer Capital's subrogation claim or the specific amount of indemnification to which MacDonald and Smythe were entitled.

The Entitlement Decision instructed the parties to confer on the amount of indemnification. The parties could not agree, and Consumer Capital, MacDonald, and Smythe moved pursuant to Court of Chancery Rule 88 to quantify the amount of the award.

## II.    LEGAL ANALYSIS

In their Rule 88 application, Consumer Capital, MacDonald, and Smythe seek indemnification for expenses totaling $1,373,164.41. Of this amount, $552,417.87 relates to the defense of the Colorado Federal Action. Included in this amount is $203,470.44

---

[24] The Funds refiled their claims in Colorado state court. The parties have indicated that insurers are paying the expenses of the state court claims. Those expenses are not at issue in this proceeding.

[25] Dkt. 213.

[26] Dkt. 220 at 20.

incurred in connection with the OpCo bankruptcy. The remaining $820,746.54 is for fees-on-fees incurred pursuing this litigation through July 31, 2017.

The Subs have not challenged the reasonableness of any individual expenses. Rather, they have advanced arguments designed to cut away broad swathes of the total amount. If all of their arguments succeeded, then they would owe nothing to MacDonald and Smythe and only $31,000 to Consumer Capital.

## A.    Consumer Capital's Right To Subrogation

In what is potentially their most significant argument, the Subs focus on the fact that Consumer Capital has paid all of the expenses that MacDonald and Smythe otherwise would have incurred to date in the Colorado Federal Action and in this proceeding. The Subs correctly observe that because of this fact, MacDonald and Smythe cannot recover any amounts in their own right. Instead, Consumer Capital must proceed by way of subrogation. The Subs believe that Consumer Capital cannot meet the requirements for subrogation for any of Smythe's fees or for the vast majority of MacDonald's fees. In my view, Consumer Capital is entitled to seek subrogation for all of the amounts that it paid on behalf of MacDonald and Smythe.

"When a purported indemnitee has all of his indemnifiable expenses paid in full and cannot show an out-of-pocket loss, he has no claim for indemnification under section 145."[27] This is because Section 145 represents "a statutory embodiment of the common

---

[27] *Levy v. HLI Operating Co., Inc.*, 924 A.2d 210, 222 (Del. Ch. 2007).

11

law of indemnification," under which the party bringing the claim must have sustained an out-of-pocket loss.[28] As a result, when an indemnitee's expenses have been paid by another party, "the indemnitee lacks standing to assert an indemnification claim against the other indemnitor in the indemnitee's own right."[29] Under this rule, MacDonald and Smythe cannot recover any amounts in their own right.

When another party has paid expenses on behalf of an indemnitee, that party can seek to enforce the indemnitee's rights by way of subrogation.[30] Under this doctrine, the payor "stand[s] in [the indemnitee's] shoes and may demand full payment from another party primarily responsible for the loss."[31] The payor succeeds to the right of payment held by the indemnitee and can enforce that right to the same extent (and subject to the same defenses) as the indemnitee.[32] To succeed, the party asserting a claim for subrogation (the "subrogee") must show that the defendant is primarily obligated for the loss, that the subrogee is secondarily responsible for the loss, and that by paying the loss, the subrogee

---

[28] *See* 8 *Del. C.* §§ 145(a)-(c) (empowering a corporation to indemnify only amounts "actually . . . incurred by the person"); *see also Levy*, 924 A.2d at 223.

[29] *Levy*, 924 A.2d at 223.

[30] *See id.* at 220-21, 223.

[31] *Id.* at 220-21 (footnote omitted).

[32] *See E. States Petroleum Co. v. Universal Oil Prods. Co.*, 44 A.2d 11, 15 (Del. Ch. 1945); *see also* 5 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* §§ 2343, 2349 (4th ed. 1918) [hereinafter Pomeroy].

satisfied the defendant's liability for the loss.[33] "One who pays the debt of another at his direct or indirect request is, therefore, usually entitled to subrogation."[34] "Ultimately, each subrogation claim turns on its specific facts and must therefore be decided on a case-by-case basis."[35]

### 1. Primary Versus Secondary Responsibility

The Subs claim that Consumer Capital cannot proceed by way of subrogation because it was not secondarily liable for the loss. Absent a contractually established hierarchy of obligations, Delaware law treats indemnitors as having equal responsibility for a loss and does not imply any primary-versus-secondary distinction.[36] Parties must establish the secondary nature of an obligation by contract. No particular magic words are required; the agreement need only contemplate that the indemnification obligation it establishes is secondary to another obligation.[37]

---

[33] *See Levy*, 924 A.2d at 220-21.

[34] *E. States*, 44 A.2d at 15 (collecting cases); *see also* Pomeroy, *supra*, § 2347.

[35] 1 Donald J. Wolfe, Jr. & Michael A. Pittinger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.08(h) (2012).

[36] *Chamison v. HealthTrust, Inc.—The Hosp. Co.*, 735 A.2d 912, 924 (Del. Ch. 1999) (explaining that when enacting the indemnification section of the Delaware General Corporation Law, the Delaware General Assembly "created no primary-secondary hierarchy among § 145 indemnitors . . . .").

[37] *See id.* (interpreting language stating that an obligation "shall be reduced by any amount such person may collect" as establishing secondary liability); *see also Sodano v. Am. Stock Exch. LLC*, 2008 WL 2738583, *14-15 (Del. Ch. July 15, 2008) (Strine, V.C.) (interpreting language providing that any payment made under the agreement "shall be reduced by any amount [the plaintiff] may collect as indemnification or advancement from

MacDonald entered into an agreement with Consumer Capital dated June 19, 2014, which makes Consumer Capital's indemnification obligation secondary to the indemnification provided by the Subs. Sections 14(a) and (b) of the agreement state:

> (a)    The rights to payment of Indemnifiable Amounts and advancement of Indemnifiable Expenses provided by this Agreement are supplemental and secondary to, and not exclusive of, any rights which Indemnitee may otherwise have against QCE Finance LLC, [OpCo] or any of their subsidiaries or affiliates by virtue of his service as an officer of Quiznos.
>
> (b)    In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee (including, without limitation, as to QCE Finance LLC, [OpCo] and any of their subsidiaries or affiliates), and Indemnitee shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.[38]

The Subs concede that these provisions establish the requisite hierarchy of indemnification obligations and make Consumer Capital's obligation secondary.

By contrast, the Subs contend that an agreement between Smythe and Consumer Capital dated August 26, 2013, does not make Consumer Capital's indemnification obligation secondary. Smythe's agreement contains a provision analogous to Section 14(b) of MacDonald's agreement, but it lacks language corresponding to Section 14(a) of MacDonald's agreement. In Section 14(a) and 14(c), Smythe's agreement states:

> (a)    The rights to payment of Indemnifiable Amounts and advancement of Indemnifiable Expenses provided by this Agreement shall

---

[another entity]" as sufficient to create a secondary obligation), *aff'd sub nom.*, *Am. Stock Exch. LLC v. Fin. Indus. Regulatory Auth. Inc.*, 970 A.2d 256 (Del. 2009) (TABLE).

[38] Dkt. 228 Ex. 17, §§ 14(a)-(b).

be in addition to, but not exclusive of, any other rights which Indemnitee may have at any time under applicable law, the Company's certificate of formation, limited liability company agreement or the organizational document of any Subsidiary or Affiliated Entity (collectively, the "Constituent Documents"), or any other agreement, vote of unitholders or managers (or a committee of managers) or otherwise, both as to action in Indemnitee's official capacity and as to action in any other capacity as a result of Indemnitee's Company Status.

\* \* \*

(c)     In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.[39]

Smythe's agreement thus contains language addressing subrogation and states that the indemnification rights granted in the agreement are "in addition to" other indemnification rights. It does not contain an express statement that the obligations created by the agreement are "secondary." According to the Subs, because Smythe's agreement lacks an explicit reference to secondary liability, the agreement fails to establish the requisite hierarchy of obligations. They point out that if the language in Smythe's agreement is sufficient, then the reference to a secondary obligation in MacDonald's agreement becomes surplusage.

This is a clever argument, but I do not find it persuasive. In my view, Smythe's agreement evidences a clear intent to establish a secondary relationship that would give rise to subrogation. That is why the provision speaks in terms of subrogation. As in the

---

[39] *Id.* Ex 16, §§ 14(a), (c).

15

*Sodano* case, it is natural that an entity like Consumer Capital would provide secondary coverage for an individual who was serving as an officer of another entity and may become liable because of the individual's service at that entity.[40] In that context, the entity that the individual was serving logically provides primary coverage.[41] Against the backdrop of the commercial relationship, the reference to subrogation establishes a hierarchical structure of indemnification obligations in which Consumer Capital's responsibility is secondary. This interpretation comports with the reading given to statutory language in the United States Code that closely resembles the provision in Smythe's agreement.[42]

The difference between Smythe's agreement and MacDonald's agreement does not defeat this interpretation. MacDonald's agreement was drafted a year later. By adding express language stating that the obligation was "supplemental and secondary," the parties improved the agreement and made their intent clearer. The language in MacDonald's agreement is thus a better version, but the language in Smythe's agreement does the trick.

---

[40] *See Sodano*, 2008 WL 2738583, at *15.

[41] *See id.* at *16.

[42] *See* 42 U.S.C. § 1395y(b)(2)(B)(iv) ("The United States shall be subrogated (to the extent of payment made under this subchapter for such an item or service) to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan."); *Zinman v. Shalala*, 835 F. Supp. 1163, 1165 (N.D. Cal. 1993) (interpreting the language of 42 U.S.C. § 1395y(b)(2)(B)(iv) to mean that the United States is only "secondarily liable in instances" where private insurance policies are obligated to pay and that the United States may recover "the full amount" it has paid from a private insurer), *aff'd*, 67 F.3d 841 (9th Cir. 1995).

Both MacDonald and Smythe entered into indemnification agreements with Consumer Capital that contemplate secondary liability. The first requirement for Consumer Capital to seek subrogation is therefore met.

### 2. Whether Consumer Capital Was A Volunteer

The Subs also claim that Consumer Capital cannot proceed by way of subrogation for any amounts that it paid as a volunteer. The Subs argue that Consumer Capital had no obligation to pay MacDonald and Smythe's expenses until it entered into agreements with them. According to the Subs, this means that Consumer Capital cannot seek to recover by way of subrogation any amounts paid on Smythe's behalf before August 26, 2013, or on MacDonald's behalf before June 19, 2014.

"[O]ne who pays the debt of another upon his own initiative, and without invitation, compulsion or the necessity for self-protection, is usually regarded as a mere volunteer without any standing in equity and cannot rely on subrogation."[43] A legal obligation to pay, however, is not a requirement.[44] "[T]he term 'volunteer,' as an exception to the right to

---

[43] *E. States*, 44 A.2d at 15; *see also* 73 Am. Jur. 2d *Subrogation* § 20 (2018) ("[S]ubrogation is unavailable for the mere stranger or volunteer who has paid the debt of another without any assignment or agreement for subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property of his own.").

[44] *See Schoon v. Troy Corp.*, 948 A.2d 1157, 1175 (Del. Ch. 2008) (holding that corporation's relationship with director meant that corporation was not a volunteer even though it had no legal obligation to pay), *superseded by statute on other grounds*, 77 Del. Laws Ch. 14, § 3 (2009); *see also* 73 Am. Jur. 2d *Subrogation* § 20 (2018) ("[A] person having a direct interest in the discharge of the debt or lien is not a volunteer.").

subrogate, is narrowly and strictly interpreted to allow a liberal application of the doctrine."[45] When addressing the related area of advancement rights, Delaware decisions have declined to apply the "volunteer" exception because it would create a perverse incentive for companies "to delay granting advancement in the hope the person owed advancement finds 'an affluent aunt, best friend, or other third party to front her defense costs' at which point the advancement right extinguishes."[46] In my view, the same reasoning applies for purposes of a director or officer's right to ultimate indemnification.[47] Under these precedents, "a company's advancement *or ultimate indemnification obligation* is not reduced merely because a volunteer advances or indemnifies the relevant expenses."[48]

Assuming the volunteer exception applies, Consumer Capital did not act as a volunteer in this case. When the payor has an existing relationship with the debtor and makes the payment to preserve and further that relationship, the payor is not a volunteer.[49]

---

[45] 73 Am. Jur. 2d *Subrogation* § 20 (2018).

[46] *Schoon*, 948 A.2d at 1175 (quoting *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *9 (Del. Ch. Jan 23, 2006) (Strine, V.C.)).

[47] *Cf. Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770, 779 n.52 (Del. Ch. 1998) ("Although indemnification and advancement are distinct rights, they are related concepts that are commonly addressed in neighboring statutory provisions.") (emphasis omitted).

[48] *Sodano*, 2008 WL 2738583, at *16 (emphasis added).

[49] *See AT&T Corp. v. Clarendon Am. Ins. Co.*, 931 A.2d 409, 432 (Del 2007) (holding that company was not a "volunteer" where it had an interest in demonstrating that it would stand behind its employees); *Schoon*, 948 A.2d at 1175 (holding that company was not a "volunteer" where it had asked representative to serve on board and the director's

Consumer Capital had an existing relationship with MacDonald and Smythe when it began making payments. Consumer Capital is owned by the Schadens, who had controlled Quiznos before the Restructuring and who continue to operate businesses in the food industry. MacDonald and Smythe were part of their management team. To be able to attract and retain qualified persons to serve as corporate officers, the Schadens (through Consumer Capital) needed to show that they would stand behind their employees. That commitment was later confirmed in the written agreements. Consumer Capital is entitled to assert claims by way of subrogation for all of the payments it made on behalf of both MacDonald and Smythe.

## B.    The OpCo Bankruptcy

Consumer Capital (proceeding by way of subrogation) seeks indemnification for a total of $552,417.87 incurred in connection with the Colorado Federal Action, including approximately $203,470.44 in connection with OpCo's bankruptcy. The Subs contend that none of the expenses incurred in connection with the bankruptcy are subject to indemnification. In my view, the Subs must indemnify Consumer Capital for those amounts. In the bankruptcy, MacDonald and Smythe were forced to defend themselves against the claims the Funds had threatened. This included eliminating provisions from the bankruptcy plan that otherwise would have substantially impaired their ability to defend themselves in the litigation that the Funds ultimately filed.

---

service in that position gave rise to litigation); *DeLucca*, 2006 WL 224058, at *9 (holding that company was not a "volunteer" where officer served on board of company's affiliate).

The Entitlement Decision held that MacDonald and Smythe were entitled to indemnification for "amounts they incurred preparing for and defending the Colorado [Federal] Action."[50] The Entitlement Decision further held that indemnification was not strictly limited to formal costs of defense but rather encompassed amounts incurred investigating the threatened claims, a process that began in summer 2013.[51] The Entitlement Decision also recognized that the filings in OpCo's bankruptcy threatened MacDonald and Smythe with litigation.[52] As part of this proceeding, MacDonald and Smythe have established that the Funds, OpCo, and their affiliates sought to use the bankruptcy proceeding to foreclose MacDonald and Smythe's indemnification rights. If the bankruptcy plan had been confirmed as originally filed, then MacDonald and Smythe's ability to defend themselves in any litigation surrounding the Restructuring would have been severely compromised.[53] In the face of this threat, MacDonald and Smythe had Jones Day file proofs of claim in the bankruptcy and raise objections to the plan, which resulted in modifications to the plan that favored MacDonald and Smythe.

---

[50] Entitlement Decision, 2017 WL 2438328, at *9.

[51] *Id.* at *6.

[52] *Id.*

[53] *See* Dkt. 226 Ex 2, at 35.

This court has recognized that a party can be defending against threatened claims when litigating a separate proceeding.[54] That was the case here. When filing their proofs of claims in the bankruptcy action and raising objections to the plan, MacDonald and Smythe were defending against the claims that the Funds already had threatened to bring and eventually would assert in the Colorado Federal Action. The expenses they incurred in the bankruptcy are therefore indemnifiable. This is not because the bankruptcy itself was a covered proceeding, but rather because the actions that MacDonald and Smythe took in connection with the bankruptcy were part of their defense against the threatened claims that ultimately were asserted in the Colorado Federal Action.

## C. The 20% Cap

Consumer Capital (proceeding by way of subrogation) seeks indemnification for total expenses of $552,417.87 that were incurred in connection with the Colorado Federal Action. Plaintiffs' counsel reached this amount by starting with total expenses of $785,805.31, then engaging in a commendably careful and detailed process to determine how much of the expenses to allocate to MacDonald and Smythe. The Subs dispute this allocation and contend that Consumer Capital can only recover 20% of this amount because MacDonald and Smythe entered into a fee-sharing arrangement with eight other defendants in the Colorado Federal Action. Under the arrangement, the parties agreed that each would

---

[54] *See Schoon*, 948 A.2d at 1170 (finding that director was defending against threatened breach of fiduciary duty claims during books-and-records action where company sought to develop factual basis for the fiduciary duty claims).

have "pro-rata (i.e., 1/10th) responsibility for the total fees and costs for Jones Day's joint defense of the [Colorado Federal Action], subject to any available insurance or indemnity."[55] Together, therefore, MacDonald and Smythe would have had *pro rata* responsibility for 2/10ths, or 20%, of the fees and costs for the defense.

Under *Scharf v. Edgcomb Corp.*,[56] MacDonald and Smythe are bound by their agreement. The *Scharf* decision addressed a claim for indemnification of expenses incurred responding to an SEC investigation. Two individuals—Scharf and Greenberg—agreed to share equally the expenses of responding to the investigation.[57] As the investigation unfolded, it focused largely on Greenberg and not on Scharf. Notwithstanding this fact, Scharf's expenses for certain months exceeded Greenberg's, meaning that Scharf accounted for more than half of the combined expenses in those months.[58] When Scharf sought indemnification, this court held that he should not be able to "achieve a more favorable allocation" than what he had agreed to with his co-defendant. The court therefore capped Scharf's recovery at 50% of the total expenses, even for months when Scharf claimed to have incurred a higher amount.[59]

---

[55] Dkt. 66 Ex. 49 (supplemented response to interrogatory 4).

[56] 2004 WL 718923 (Del. Ch.), *rev'd on other grounds*, 864 A.2d 909 (Del. 2004).

[57] *Id.* at *5-6.

[58] *Id.* at *6.

[59] *Id.*

22

The *Scharf* decision provides guidance here. Having agreed to an allocation before they knew whether they would be entitled to shift their fees to a third party, MacDonald and Smythe should not now be able to recut that allocation so as to impose a greater burden on the third party than they would have borne themselves. Courts give deference to decisions made by individuals who potentially must bear their own expenses precisely because they have skin in the game and an incentive to act rationally and efficiently.[60] During the advancement phase, the possibility that covered persons may ultimately have to pay the bill gives them an incentive to monitor counsel.[61] By contrast, once it is clear

_____

[60] *See, e.g.*, *First Fed. Sav. & Loan Ass'n v. United States*, 88 Fed. Cl. 572, 585 (2009) (holding that plaintiff "had every incentive to exercise control over the work of its counsel and to monitor closely the cost of the litigation" given the "lack of any assurance" that it would prevail); *Fla. Rock Indus., Inc. v. United States*, 9 Cl. Ct. 285, 289 (1985) (finding that "the risk of abuse" in the fee award process "is minimal because plaintiff has no assurance of recovering and must assume it will bear the full cost of the litigation"); *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *6 (Del. Ch. Aug. 13, 2010) ("A further indication of reasonableness is the reality that when Aveta filed its motion to enforce and paid the expenses it now seeks to recover, Aveta did not know that it would be able to shift those expenses to Bengoa. Aveta had a potential claim to recover fees under Section 13.5 of the Purchase Agreement, but only if Aveta prevailed. If not, then Aveta would bear its own expenses. Aveta therefore had sufficient incentive to monitor its counsel's work and ensure that counsel did not engage in excessive or unnecessary efforts."); *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1998 WL 155550, at *2 (Del. Ch. Mar. 30, 1998) (considering when evaluating reasonableness of fee award for bad faith litigation that client pursuing award had faced prospect of bearing full cost of litigation), *aff'd*, 720 A.2d 542 (Del. 1998).

[61] *See Danenberg v. Fitracks, Inc.*, 58 A.2d 991, 997 (Del. Ch. 2012) (declining to review individual time entries in the advancement context because "[i]f a party cannot be certain that it will be able to shift expenses at the time the expenses are incurred, the prospect that the party will bear its own expenses provides 'sufficient incentive to monitor its counsel's work and ensure that counsel [does] not engage in excessive or unnecessary efforts'" (quoting *Aveta*, 2010 WL 3221823, at *6)); *accord Weil v. VEREIT Operating*

that a third party will have to bear the cost in the form of ultimate indemnification, the incentives change. Particularly when some categories of expenses are covered while others are not, the powerful force of economic self-interest can cause individuals to engage in behavior designed to increase the amount that the third party must pay.[62]

In this case, MacDonald and Smythe agreed to an allocation before they knew that the Subs would have to bear their expenses in the Colorado Federal Action. Consumer Capital paid their expenses on that basis. Now that this court has held that the Subs must indemnify Consumer Capital for MacDonald and Smythe's share, there is an understandable desire to shift more expenses into the recoverable category. The better course is to follow *Scharf* and hold MacDonald and Smythe to the allocation they reached when they faced the risk of bearing their own expenses. Because Consumer Capital stands in their shoes for purposes of subrogation, Consumer Capital is only entitled to recover the 20% that MacDonald and Smythe would have had to pay.

The total amount of expenses incurred in the Colorado Federal Action (including the OpCo bankruptcy) is $785,805.31. MacDonald and Smythe's counsel excluded $57,946 from this amount, leaving $727,859.31. Consumer Capital is entitled to indemnification equal to 20% of this amount, or $145,571.86.

---

*P'ship, L.P.*, 2018 WL 83442, at *11 (Del. Ch. Feb. 13, 2018); *Horne v. OptimisCorp*, 2017 WL 838814, at *5 (Del. Ch. Mar. 3, 2017).

[62] *See Dore v. Sweports, Ltd.*, 2017 WL 415469, at *14-16 (Del. Ch. Jan. 31, 2017) (finding that covered persons modified time entries and expenses once they knew that a third party would bear their expenses to gross up the recovery).

**D.      Fees-On-Fees**

Consumer Capital, MacDonald, and Smythe seek to recover $820,746.54 for pursuing this litigation. The Subs contend that Consumer Capital is not entitled to subrogation for fees-on-fees, but because Consumer Capital stands in the shoes of MacDonald and Smythe, Consumer Capital can recover fees-on-fees to the same extent that MacDonald and Smythe could have recovered them. Plaintiffs who successfully enforce their indemnification rights in Delaware are entitled to fees-on-fees.[63] Because MacDonald and Smythe could have recovered fees-on-fees, Consumer Capital can recover them as well.[64]

Any award of fees-on-fees must be "reasonably proportionate to the level of success . . . achieved."[65] Different methods for assessing proportionality can be used depending on the nature of the case.[66] In this case, Consumer Capital seeks an award of fees-on-fees in the amount of $820,764.54 for expenses incurred through July 31, 2017. MacDonald and Smythe claim to have spent a total of $1,985,901.72 pursuing the case, so this request equates to roughly 39% of the total expenses that they incurred.

---

[63] *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 560-62 (Del. 2002).

[64] *See Levy*, 924 A.2d at 224 (permitting co-indemnitor who sought contribution to recover fees-on-fees).

[65] *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 178, 184 (Del. Ch. 2003) (Strine, V.C.).

[66] *See White v. Curo Texas Holdings, LLC*, 2017 WL 1369332, at *17 (Del. Ch. Feb. 21, 2017).

The Subs point out that until August 21, 2015, MacDonald and Smythe were pursuing only the Assignment Agreement Claims. Between the filing of the litigation and August 21, 2015, MacDonald and Smythe incurred $735,943.21. They did not prevail on any of the Assignment Agreement Claims. In my view, these amounts are not recoverable.

Deducting the amounts incurred before August 21, 2015, leaves a total of $1,249,958.41. The Subs contend that Consumer Capital should only be awarded 2.4% of this amount, which strikes me as unreasonably low. Rather, as I see it, from August 21 onward there were two large groups of claims in this case: the Assignment Agreement Claims and the Operating Agreement Claims. The Employment Agreement Claims made a brief appearance, but they were stayed in favor of arbitration.

MacDonald and Smythe prevailed on the Operating Agreement Claims, but lost on the Assignment Agreement Claims. Because MacDonald and Smythe prevailed on one of the two major categories of claims, I will start with one-half as the relevant proportion of success. I will then further reduce this amount to reflect the fact that I have only awarded the plaintiffs 20% of the expenses they sought for the Colorado Federal Action. Multiplying the two percentages results in a fees-on-fees percentage of 10%. Applying this percentage to the base amount of $1,249,958.41 results in a fees-on-fees award (rounded up) of $125,000.

In my view, this amount is reasonable. The degree of success that MacDonald and Smythe enjoyed could have been achieved simply by moving for summary judgment on the Operating Agreement Claims. In my experience, briefing on such a motion likely would have cost between $100,000 and $200,000. My award of $125,000 falls within that

expected range. It represents a reasonable amount for the degree of success that the plaintiffs achieved.

## E.     Pre-Judgment Interest

"Without interest on expenses actually paid [by an indemnitee], indemnification would be incomplete."[67] "Pre-judgment interest is awarded to compensate the indemnitee for the use of the money while such indemnitee was entitled to it, and not by any wrongdoing by the corporation. Interest in this situation begins to accrue when the claim for indemnification is made."[68] This means "the date when [the plaintiff] specified the amount of reimbursement demanded and produced his written promise to pay."[69] Part of the rationale behind requiring a plaintiff to make a demand is "that the responding corporation could not be expected to guess at its obligation and that it should only pay interest from the time it fairly had the opportunity to satisfy the plaintiff's demand for reimbursement."[70]

Delaware courts have not addressed whether the demand must specify the source of the advancement or indemnification right. Given the silence in the case law, MacDonald and Smythe posit that pre-judgment interest and fees-on-fees should run beginning on July

---

[67] *Merritt-Chapman & Scott Corp. v. Wolfson*, 321 A.2d 138, 144 (Del. Super. 1974), *superseded by statute on other grounds*, 6 *Del C.* § 145(k).

[68] Wolfe & Pittinger, *supra*, § 8.02[g].

[69] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 n.10 (Del. 1992).

[70] *Citrin v. Int'l Airport Ctrs.*, 922 A.2d 1164, 1168 (Del. Ch. 2006) (Strine, V.C.).

1, 2014, when they made their first demand for advancements. The Subs disagree. They claim that parties routinely identify the source of the advancement or indemnification right and that an entity should not be forced to incur pre-judgment interest unless it can evaluate fairly the right being asserted. Because MacDonald and Smythe did not assert their rights under the Subs' operating agreements until August 21, 2015, the Subs contend that interest should not begin accruing until that date.[71]

In my view, the Subs have the stronger argument. MacDonald and Smythe made their demand under the Subs' operating agreements on August 21, 2015. Until this date, the operating agreements were not at issue. Interest should not begin to run until a plaintiff makes its demand under the obligation that gives rise to the recovery. Therefore, pre-judgment interest will accrue on the underlying amounts beginning on August 21, 2015. Pre- and post-judgment interest will accrue at the statutory rate, compounded quarterly.[72] Pre-judgment interest will accrue on the fees-on-fees from August 30, 2017, which is the date when the plaintiffs submitted their demand for enforcement expenses and supporting invoices to the Subs.

---

[71] At oral argument, the Subs introduced a new date, March 13, 2017, as the date from which pre-judgment interest and fees-on-fees should begin to run. Dkt. 236 at 19. The Subs argued that this is actually the correct date because it is the date on which the deadline to seek certiorari passed in the Colorado Federal Action, making MacDonald and Smythe's indemnification claims ripe. While there is some intellectual merit to this date, it was raised too late to be considered. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[72] *See* 6 *Del. C.* § 2301(a).

## III.    CONCLUSION

The Subs shall pay Consumer Capital $145,571.86 as indemnification for the Colorado Federal Action plus $125,000 in fees-on-fees. Pre-judgment interest on the former will accrue beginning on August 21, 2015. Pre-judgment interest on the latter will accrue beginning on August 30, 2017. Interest will accrue on all amounts at the legal rate, compounded quarterly, until the date of payment.